Ben Travis (SBN 305641)
**BEN TRAVIS LAW, APC**
4660 La Jolla Village Dr., Suite 100
San Diego, CA 92122
(619) 353-7966
ben@bentravislaw.com

Steve Cohen (*pro hac vice forthcoming*)
**POLLOCK COHEN LLP**
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Scohen@PollockCohen.com

Jacob Gardener (*pro hac vice forthcoming*)
**WALDEN MACHT HARAN & WILLIAMS LLP**
250 Vesey St., 27th Floor
New York, NY 10281
(212) 335-2965
jgardener@wmhwlaw.com

*Attorneys for Plaintiffs Jenniffer Roiz,*
*Claudine Castillo, Candyce Marto,*
*Kevin Maedel and The Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFFER ROIZ, CLAUDINE CASTILLO, CANDYCE MARTO, and KEVIN MAEDEL on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY, MAGELLAN HEALTH, INC., MAGELLAN HEALTHCARE, INC., and HUMAN AFFAIRS INTERNATIONAL OF CALIFORNIA, | ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No.:

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**CLASS ACTION**

Plaintiffs Jenniffer Roiz, Claudine Castillo, Candyce Marto, and Kevin Maedel ("Plaintiffs") bring this class action for damages, equitable relief, and injunctive relief against BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY ("Blue Shield"), MAGELLAN HEALTH, INC., MAGELLAN HEALTHCARE, INC., and HUMAN AFFAIRS INTERNATIONAL OF CALIFORNIA ("Magellan," together with MAGELLAN HEALTH, INC. and MAGELLAN HEALTHCARE, INC.) (Blue Shield and Magellan are collectively referred to as "Defendants"). Plaintiffs allege the following based upon personal information as to allegations regarding themselves, their own investigation, and the investigation of their counsel, and on information and belief as to all other allegations.

## INTRODUCTION

1.      There is a mental health crisis in this country and in this state. It is afflicting men and women, children and adults, and people of all income levels and backgrounds. And it is exacerbated by companies, like Defendants, that mislead vulnerable individuals in need of qualified mental health providers by publishing grossly inaccurate directories of doctors and therapists. These inaccurate directories are known as "ghost networks."

2.      Ghost networks are directories of supposedly available, in-network providers that contain so many incorrect or duplicative entries that the network is largely illusory. Mental health provider directories are more likely than any other medical specialty to be ghost networks.

3.      When there are very few—or no—accessible, available doctors in Defendants' networks, the networks do not comply with state and federal network adequacy laws. Such grossly inaccurate listings in a directory also violate the No Surprises Act, the Mental Health Parity and Addiction Equity Act, Defendants' contractual obligations to Plaintiffs, and California state insurance and consumer protection laws.

4.      Defendants engage in unfair competition and deceptive business practices by knowingly publishing inaccurate and misleading provider directories. They do so for several reasons: 1) a robust provider network is attractive to potential customers; 2) a seemingly robust directory of providers gives Defendants the appearance of compliance with state and federal network adequacy laws (without the costs associated with creating and maintaining an adequate network and

accurate directory); and 3) when members forego care after a time-consuming and frustrating provider search, Defendants do not have to pay for the care they would have received.

5.      By publishing provider directories in which the vast majority of doctors do not exist, cannot be contacted through the information provided, are not actually in-network with Defendants, and/or are not accepting new patients, Defendants actively harm their members. When Defendants misrepresent their networks, members like Plaintiffs pay inflated premiums for an insurance plan that does not actually offer an adequate provider network to meet their needs. Even when plan members pay no premium, when Defendants misrepresent their networks, members enroll in an insurance plan that does not actually provide an adequate network to meet their needs. Many members, like Plaintiffs, have no choice but to utilize out-of-network doctors, incurring thousands of dollars in expenses.

6.      Plaintiffs' insurance policies claim to cover mental health care with robust networks of available mental health providers made available by Defendants. In reality, those networks are threadbare: there are very few mental health providers in California who actually take the insurance, are in-network, and accept new patients. Thus, the promised coverage is largely non-existent. The failure by an insurance company or health care service plan to have an adequate network to meet members' needs is itself a violation of federal and state network adequacy laws.

7.      These harms are not just financial. They also exacerbate members' mental health problems. The people using Defendants' provider directories are often desperate for mental health care for themselves or their loved ones. Members searching for care often spend countless hours calling providers that Defendants have represented as available, accessible, and in-network, only to find out that the providers do not participate in Defendants' network, do not offer the services listed in Defendants' provider directories, are not qualified to provide those services, or cannot be reached at the phone number listed by Defendants.

8.      Some members, like Plaintiffs, are forced to delay treatment while struggling to find a provider. Others abandon their search for care, resulting in serious, potentially life-threatening consequences. Thus, the coverage promised by Defendants is largely illusory.

**JURISDICTION AND VENUE**

9.      Federal law provides an essential element of Plaintiffs' claims. Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

10.      This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least one member of the proposed class is a citizen of a state other than Delaware, which is the state of citizenship of Defendants Magellan Health, Inc. and Magellan Healthcare, Inc.

11.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this Judicial District.

12.      Divisional Assignment: Assignment to the San Francisco or Oakland Division is proper under Civil Local Rules 3-2(c) and 3-2(d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Alameda County.

**THE PARTIES**

**I.      Plaintiffs**

13.      Plaintiff Jenniffer Roiz is a resident of Orange County, California. She has been enrolled in the Blue Shield's Platinum Full PPO 0/10 OffEx plan since 2024.

14.      Plaintiff Claudine Castillo is a resident of Solano County, California. She and her 16-year-old son have been enrolled in the Blue Shield San Francisco Health Service System Trio HMO plan since 2022.

15.      Plaintiffs Candyce Marto and Kevin Maedel are residents of San Bernardino County, California. They are enrolled in the TRIO HMO Per Admit 20-250 plan and have been enrolled in a Blue Shield HMO plan through Mr. Maedel's employer since 2000.

## II.     Defendants

16.     Defendant Blue Shield of California Life & Health Insurance Company ("Blue Shield") is a stock corporation incorporated and headquartered in Oakland, California, and registered to do business in California. It administers the Blue Shield of California health insurance plans.

17.     Defendant Magellan Health, Inc. is a Delaware corporation headquartered in Arizona. It administers the mental health benefits for many of Blue Shield's insurance plans.

18.     Defendant Magellan Healthcare, Inc. is a Delaware corporation and a subsidiary of Defendant Magellan Health, Inc. headquartered in Arizona. It administers the mental health benefits for many of Blue Shield's insurance plans.

19.     Defendant Human Affairs International of California is a stock corporation incorporated in California and a subsidiary of Defendant Magellan Healthcare, Inc. It is registered to do business and headquartered in California. It administers the mental health benefits for many of Blue Shield's insurance plans.

## BACKGROUND & CONTEXT

### I.     The Mental Health Crisis in America

20.     There is a mental health crisis in the United States. According to the National Institute of Mental Health, an estimated 59.3 million adults in the U.S.—approximately 23.1% of adults—struggle with mental illness.[1] Mental health problems are even more prevalent in younger adults, with 36.2% of adults ages 18–25 and 29.4% of adults ages 26–49 reportedly having a mental illness. Despite this prevalence, roughly half (49.4%) of the 59.3 million adults living with mental illness have not received mental health treatment within the last year.[2]

21.     In 2022, an estimated 15.4 million adults in the U.S. (6% of the adult population) had a *serious* mental illness, defined as "a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life

---

[1] National Institute of Mental Health, *Mental Illness Statistics*, https://www.nimh.nih.gov/health/statistics/mental-illness.

[2] *Id.*

activities."[3] Despite the potentially disabling or even life-threatening effects of forgoing treatment, one third of those with serious mental illness do not receive treatment.[4]

22.    According to the Centers for Disease Control and Prevention ("CDC"), among adolescents aged 12 to 17 years old, 20.9% have had a major depressive episode; among high school students, 36.7% have had persistent feelings of sadness or hopelessness, and 18.8% have attempted suicide.[5]

23.    With the rates of pediatric self-harm and suicide rising dramatically,[6] the Surgeon General of the United States has described mental health as "the defining public health crisis of our time,"[7] and urged that "every child ha[ve] access to high-quality, affordable, and culturally competent mental health care."[8]

24.    Despite the "profound" consequences of untreated mental illness in children and adolescents, which are associated with "school failure, teenage pregnancy, unstable employment, substance use, violence including suicide and homicide, and poor medical outcomes,"[9] the CDC

---

[3] *Id.*

[4] *Id.*

[5] Rebecca H. Bitsko *et. al.*, *Mental Health Surveillance Among Children – United States, 2013–2019*, Ctrs. for Disease Control and Prevention (2022), https://www.cdc.gov/mmwr/volumes/71/su/su7102a1.htm.

[6] Bommersbach et al., *National Trends in Mental Health-Related Emergency Department Visits Among Youth, 2011-2020*, J. of the Am. Med. Ass'n (May 2, 2023), https://pubmed.ncbi.nlm.nih.gov/37129655/ (finding a 57% increase in suicide among young Americans from 2009 to 2019, and a staggering 329% increase in pediatric self-harm visits from 2007 to 2016).

[7] Matt Richtel, *The Surgeon General's New Mission: Adolescent Mental Health*, N.Y. TIMES, (Mar. 21, 2023), https://www.nytimes.com/2023/03/21/health/surgeon-general-adolescents-mental-health.html.

[8] *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory*, Off. of the Surgeon Gen. at 12 (2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.

[9] School-Based Mental Health: Pediatric Mental Health Minute Series, Am. Academy of Pediatrics, https://www.aap.org/en/patient-care/mental-health-minute/school-based-mental-health/.

estimates that only approximately 20% of children with a mental, emotional, or behavioral disorder receive care from a specialized mental health provider.[10]

## II.    Federal and State Requirements for Health Insurers

### A.    Insurers Must Ensure Accuracy of Provider Directories

25.    As awareness of the problem and prevalence of ghost networks grows, federal and state laws and regulations have been promulgated to protect consumers from the harms of ghost networks.

26.    The No Surprises Act, which became effective in 2022, requires insurers to update and verify their plans' provider directories at least every 90 days.[11] Where plans are unable to verify provider data, they must establish a procedure to remove providers from their directories.[12] Health plans must also update provider information within two business days of receiving an update from a provider.[13] When a member telephonically requests information about whether a provider is in-network, the plan must respond within one business day of the request.[14]

27.    California Insurance Code Section 10133.15 and Section 1367.27 of the Knox-Keene Act[15] require insurers to "publish and maintain" a provider directory "with information on contracting providers that deliver health care services to the insurer's insureds, including those that accept new patients." This directory "shall not list or include information on a provider that is not currently under contract with the insurer." This directory must be made available online and upon request in hard copy to all members of the public. Insurers must update their directories "at least quarterly, or more frequently, if required by federal law," and "at least weekly . . . when informed of" updates from providers. Insurers are required to "take appropriate steps to ensure the accuracy of

---

[10] Ctrs. for Disease Control and Prevention, *Improving Access to Children's Mental Health Care*, https://archive.cdc.gov/#/details?q=mproving%20Access%20to%20Care,%20Children%E2%80%99s%20Mental%20Health%22&start=0&rows=10&url=https://www.cdc.gov/childrensmentalhealth/access.html.

[11] 42 U.S.C. § 300gg-115(a)(2).

[12] *Id.*

[13] *Id.*

[14] 42 U.S.C. § 300gg-115(a)(3).

[15] Codified at California Health & Safety Code, section 1340 et seq.

the information concerning each provider listed" and must investigate and rectify reported inaccuracies within 30 business days.

28.     These federal and state laws reflect that governments recognize the harmful consequences of inaccurate provider directories. Despite these legislative efforts to shield consumers from ghost networks, surprise bills, and inadequate in-network care, Defendants continue to violate these laws.

**B.     Insurers Must Have an Adequate Network of Providers**

29.     Federal and state laws also require health plans to offer a network that includes an adequate number of in-network providers to meet members' needs.

30.     The Affordable Care Act first established this network adequacy framework, requiring that all qualified health plans ensure the provision of a network that is "sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay."[16]

31.     In addition, the Mental Health Parity and Addiction Equity Act ("MHPAEA"), 42 U.S.C. § 300gg-26, incorporated into the Affordable Care Act via 45 C.F.R. 156.115, provides that mental health and substance use disorder benefits must not be provided on less favorable terms than medical and surgical benefits, specifically with respect to annual, aggregate, or lifetime limits on coverage, financial requirements, treatment limitations, and out-of-network coverage.[17]

32.     MHPAEA regulations provide that "all plan standards that limit the scope or duration of benefits for services are subject to the nonquantitative treatment limitation parity requirements. This includes restrictions such as geographic limits, facility-type limits, and network adequacy."[18]

33.     California Insurance Code Section 10133.54 and Section 1367.03 of the Knox-Keene Act require health insurers and health care service plans to provide members with timely access to care by, among other things, establishing and maintaining a provider network that "has adequate

---

[16] 45 C.F.R. § 156.230(a)(1)(ii).
[17] 29 U.S.C. §1185a(a); 42 U.S.C. § 300gg-26(a).
[18] Ctrs. for Medicare & Medicaid Services, *The Mental Health Parity and Addiction Equity Act* (2023), https://www.cms.gov/marketplace/private-health-insurance/mental-health-parity-addiction-equity; *see also* 29 C.F.R. 2590.712(c)(4).

capacity and availability of licensed health care providers to offer insureds" appointments for mental health care "within 10 business days of the request for appointment." When the insurer's network is inadequate to meet this standard, the insurer is required to "arrange for the provision of services outside the insurer's contracted network" at a cost to the member not exceeding "applicable in-network copayments, coinsurance, and deductibles."

34.    Section 2240.01 of Chapter 10 of the California Code of Regulations requires insurers to ensure that "there are mental health and substance use disorder professionals with skills appropriate to care for the mental health and substance use disorder needs of covered persons and with sufficient capacity to accept covered persons within a maximum travel time of 30 minutes or a maximum travel distance of 15 miles of each covered person's residence or workplace. The network must adequately provide for mental health and substance use disorder treatment, including behavioral health therapy." Within an insurer's network, "there must be mental health and substance use disorder providers of sufficient number and type to provide diagnosis and medically necessary treatment through providers acting within their scope of license and scope of competence." Insurers must also ensure that their plan members can access information about their mental health benefits, providers, and other relevant information by contacting the insurer. When medically appropriate care is not available from a qualified, in-network provider, the insurer must "arrange for the required care with available and accessible providers outside the network, with the patient responsible for paying only cost-sharing in an amount equal to the cost-sharing they would have paid for provision of that or a similar service in-network."

35.    By inflating their provider directories with inaccurate listings, insurers appear to meet federal and state network adequacy requirements when in reality they do not.[19]

36.    Defendants are in violation of federal and state law requiring network adequacy.

---

[19] *Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks*, U.S. Senate Fin. Comm. (May 3, 2023), https://www.finance.senate.gov/hearings/barriers-to-mental-health-care-improving-provider-directory-accuracy-to-reduce-the-prevalence-of-ghost-networks (hereinafter "Senate Hearings on Mental Health Care").

**C.      ERISA Requires Covered Insurers to Meet Benefit Obligations, Uphold Fiduciary Responsibilities, and Provide Truth in Marketing**

37.      ERISA was enacted by Congress in 1974 in recognition of the proliferation of employee benefit plans that directly impacted the well-being of millions of employees.[20] The establishment of national standards for employee benefit plans was deemed necessary, in part, to guard against exploitation of beneficiaries due to asymmetric information regarding plans.[21]

38.      ERISA requires insurers to provide coverage in accordance with their plans; to resolve claims in accordance with their plans; to uphold the fiduciary duties of loyalty and care in administering their plans; and to ensure that no false statements or representations are made in connection with the marketing or sale of a plan.[22]

39.      MHPAEA is incorporated into ERISA at 29 U.S.C. § 1185a and generally requires that plans offer equally favorable coverage for mental health benefits and medical and surgical benefits.

40.      Section 720 of the Employee Retirement Income Security Act of 1974 and Section 9820 of the Internal Revenue Code both require health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when it is unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

**III.    Ghost Networks**

41.      The prevalence and harms of mental health ghost networks have been widely investigated and confirmed by countless studies and reports, including by *The New York Times*,[23]

---

[20] 29 U.S.C. § 1001(a).

[21] *Id.*

[22] 29 U.S.C. §§ 1104, 1132, 1149.

[23] Jay Hancock, *Insurers' Flawed Directories Leave Patients Scrambling for In-Network Doctors*, N.Y. Times (Dec. 3, 2016), https://www.nytimes.com/2016/12/03/us/inaccurate-doctor-directories-insurance-enrollment.html.

*The Washington Post*,[24] academics,[25] the American Medical Association,[26] the Government

Accountability Office,[27] and more.[28]

     42.    As explained by a Yale Law & Policy Review article on ghost networks, the effects

of Defendants' ghost networks are far-reaching and damage the very structure of our health care

system:

> Directory errors cost consumers money and erode regulatory consumer safeguards. They deceive consumers about the value of the coverage they are purchasing by concealing plans' actual provider networks, subjecting consumers to predatory billing practices, and breaking the link between consumer choices and plan practices that undergirds much of the American health insurance regulatory structure.[29]

---

[24] Katherine Ellison, *73 doctors and none available: How ghost networks hamper mental health care*, WASH. POST (Feb. 19, 2022), https://www.washingtonpost.com/health/2022/02/19/mental-health-ghost-network/.

[25] *See, e.g.*, Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 YALE L. & POL'Y REV. 78 (2021).

[26] *Improving Health Plan Provider Directories*, CAQH & AM. MED. ASS'N., 3, https://www.caqh.org/sites/default/files/other/CAQH-AMA_Improving%20Health%20Plan%20Provider%20Directories%20Whitepaper.pdf (finding that "more than half of patients use [the provider directory] to select a physician.") (hereinafter "Improving Health Plan Provider Directories").

[27] *Mental Health Care Access Challenges for Covered Consumers and Relevant Federal Efforts*, U.S. Gov't Accountability Office, Report to the Chairman, Comm. on Fin., U.S. Senate, 2, (Mar. 2022), https://www.gao.gov/assets/gao-22-104597.pdf.

[28] *See, e.g.*, Ellison, supra n. 24; Jack Turban, *Ghost networks of psychiatrists make money for insurance companies but hinder patients' access to care*, Stat News (June 17, 2019), https://www.statnews.com/2019/06/17/ghost-networks-psychiatrists-hinder-patient-care/; *Online Provider Directory Review Report*, Ctrs. for Medicare & Medicaid Servs., 1, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/Provider_Directory_Review_Industry_Report_Round_3_11-28-2018.pdf; Cama et al., *Availability of Outpatient Mental Health Care by Pediatricians and Child Psychiatrists in Five U.S. Cities*, INT'L J. HEALTH SERV. 47(4) (2017), https://pubmed.ncbi.nlm.nih.gov/28474997/; Malowney et al., *Availability of Outpatient Care From Psychiatrists: A Simulated-Patient Study in Three U.S. Cities*, Psychiatry Online (2015), https://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.201400051; Zhu et al., Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access in Oregon Medicaid, Health Affairs 41(7) (2022), https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00052; Susan H. Busch & Kelly A. Kyanko, *Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills*, Health Affairs 39(6) (2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2019.01501.

[29] Burman, supra n. 55, at 85.

A.     **The United States Senate Finance Committee Ghost Networks Hearings**

43.     A recent study of twelve major plan directories by the Senate Finance Committee majority revealed that over 80% of the listed in-network providers were in reality "either unreachable, not accepting new patients, or not in-network."[30] For Oregon, no successful appointments could be made.[31] On average, "[c]all times ranged from 1-3 hours to contact 10 listings per plan."[32]

44.     In May 2023, the United States Senate Finance Committee held a hearing on this exact topic. One testifying witness summarized her Sisyphean experience trying to find a mental health provider through her insurance plan's directory:

> Calling psychiatrists within D.C. and Maryland, selected out of what was like a digital white-pages phone book, turned into one rejection after another. . . . I spent countless days and hours scouring the network, despite working long hours in a high-level management position. When was there time to find a psychiatrist? I had to make the time, though, as my job, and more importantly my life, depended on it.[33]

45.     People seeking a mental health provider on a ghost network spend countless, difficult hours searching for care, which is extremely burdensome for a person who may be experiencing a mental health emergency. As Dr. Robert Trestman, representing the American Psychiatric Association, testified:

> For those who are healthy and well educated, going through an inaccurate provider list and being told repeatedly that "we are not taking new patients," "this provider has retired," "we no longer accept your insurance," or leaving a message with no one returning the call is at best frustrating. For people who are experiencing significant mental illness or substance use disorders, the process . . . is at best demoralizing and at worst set up to precipitate clinical deterioration and a preventable crisis. Many are already experiencing profound feelings of worthlessness, fear, grief from loss and trauma, and/or the impact of substance use; some are in crisis and suicidal. . . . Even when they make the effort to reach out to find help, something that can be very difficult anyway, their efforts to cull through an inaccurate

---

[30] *Majority Study Findings: Medicare Advantage Plan Directories Haunted by Ghost Networks*, Senate Comm. on Fin. at 1 (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/050323 Ghost Network Hearing - Secret Shopper Study Report.pdf.

[31] *Id.* at 7.

[32] *Id.* at 4.

[33] Senate Hearings on Mental Health Care (Testimony of Keris Jän Myrick at 2–3), available at https://www.finance.senate.gov/imo/media/doc/barriers_to_mental_health_care_improving_provider _directory_accuracy_to_reduce_the_prevalence_of_ghost_networks.pdf.

provider list results in more rejection and failure, exacerbating these feelings. Some give up looking for care. Others delay care.[34]

46.     When people in need are unable to find an in-network mental health provider, urgent mental health treatment is often delayed and, at worst, abandoned completely. Others seeking care rely on the directory to find a provider, only to face significant, unexpected costs when it becomes clear that the provider is not actually covered by their plan. And, in other cases, people urgently seeking care knowingly settle for seeing an out-of-network provider at great expense because they desperately need help and it is their only option.

47.     Though the effects of ghost networks are far-reaching and complex, the wrongful conduct at issue is simple: insurance companies' ghost networks mislead consumers. As Senator Ron Wyden stated in his opening remarks:

> [W]hen insurance companies host ghost networks, they are selling health coverage under false pretenses, because the mental health providers advertised in their plan directories aren't picking up the phone or taking new patients. In any other business, if a product or service doesn't meet expectations, consumers can ask for a refund. . ..
>
> It's not hard to imagine how many Americans simply give up and go on struggling without the help they need. . ..
>
> If a student were writing an essay and 80 percent of their citations were incorrect or made up, they'd receive an "F." If a business gave the SEC false or incorrect information, it would face extremely severe consequences. So in my view insurance companies should face strict consequences if their products don't live up to the billing.[35]

48.     When asked whether plans made their directories "inaccurate by design," testifying witness Mary Giliberti, the Chief Public Policy Officer of Mental Health America, responded:

> MS. GILIBERTI: [A]bout 60 percent of the plans [being discussed] don't have out of network coverage, so if you get really frustrated and you pay on your own then they're not paying anything.
>
> SENATOR WARREN: So the more the Medicare Advantage plan can frustrate you . . . the more you'll just go somewhere else. And that means it's not money out of their pockets. . . . So, look, what we are really saying here is that it is in the financial interests of these . . . plans to discourage

---

[34] *Id.* (Testimony of Robert L. Trestman, PhD, MD at 2–3).

[35] *Wyden Calls for Action to Get Rid of Ghost Networks, Releases Secret Shopper Study*, U.S. Senate Fin. Comm., Chairman Ron Wyden (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/Wyden%20Ghost%20Networks%20Hearing%20Remarks%205.3.23.pdf.

beneficiaries from accessing care . . . . Because here's the key that underlines this. Whatever insurers don't spend on care as a result of tactics like outdated provider directories or overly restrictive networks or inaccurate information, whatever they don't spend on care, they get to keep.[36]

## FACTUAL ALLEGATIONS

## I.    Plaintiffs' Needs for Mental Health Care

### A.    Jenniffer Roiz

49.    Plaintiff Jenniffer Roiz is a resident of Orange County, California.

50.    Ms. Roiz has been enrolled in the Blue Shield's Platinum Full PPO 0/10 OffEx plan since August 2024.

51.    When enrolling in health coverage through her employer in August 2024, Ms. Roiz specifically selected Blue Shield's Platinum offering—the most expensive option—because she understood it to offer the "best" coverage. She was seeing a therapist weekly at the time she enrolled, so she selected the Platinum plan because it required the lowest copayment for in-network mental health services. She relied on Blue Shield's misrepresentations about the extent of coverage and the breadth of the provider network when she decided to enroll in this plan.

52.    Ms. Roiz pays a premium of approximately $200 per month for her insurance through Blue Shield.

53.    After enrolling in coverage with Blue Shield and learning that her existing therapist was not in-network, Ms. Roiz began searching for an in-network provider while continuing to see her existing therapist. Ms. Roiz consulted the provider directory on Blue Shield's website, which redirected her to the Magellan directory, which listed hundreds of providers matching her search criteria, including accepting new patients. Ms. Roiz called ten providers from the list, but none answered the phone. Ms. Roiz left voicemails for each of the providers, and only two returned her calls. Both providers told her they were not accepting new patients.

54.    Following her unsuccessful search in the Defendants' online directories, Ms. Roiz contacted Blue Shield by phone to report her difficulties locating an in-network provider. Blue

---

[36] Senate Hearings on Mental Health Care, *supra* n. 33 (Testimony of Senator Elizabeth Warren).

Shield informed her that the directory online may not be up-to-date and offered to mail her a hard copy of the current directory. However, after receiving the hard copy directory, Ms. Roiz realized that the same providers were inaccurately listed there as well.

55.     Unable to find care through Defendants' directories, Ms. Roiz continued to see her out-of-network therapist, paying $150 per weekly session and incurring hundreds of dollars in bills. Eventually, unable to afford any additional out-of-network care, she stopped seeing her therapist.

56.     Although Blue Shield agreed to cover three months of services with her current therapist at the in-network rate so that Ms. Roiz could identify an in-network provider, they did not extend this three-month allowance when Ms. Roiz was unable to find an in-network provider. After the end of the three-month period, Ms. Roiz was required to pay the out-of-network coinsurance for each visit with her therapist. She stopped seeing the therapist shortly after that point because she could not afford the high cost of the plan's out-of-network coinsurance.

57.     Ms. Roiz relied on Defendants' marketing materials, website, provider directories, and plan documents when deciding to enroll in Defendants' plan; and, once enrolled, to understand her benefits.

58.     When selecting the Platinum PPO plan, Ms. Roiz relied on implicit and explicit representations by Defendants that the provider directory was robust and accurate, especially with respect to mental health providers.

59.     Over the same time period during which Defendants failed to supply in-network mental health providers within a reasonable distance of Ms. Roiz's residence, Ms. Roiz identified and received treatment from in-network providers within a reasonable distance for a variety of types of medical care including primary care, gastroenterology, and gynecology.

60.     On information and belief, over the same period, other members of the class were able to identify in-network providers within a reasonable distance for analogous medical and surgical services, including physical therapy, orthopedics, pain management, psychiatry, neurology, cardiology, podiatry, dermatology, rheumatology, gastroenterology, oncology, immunology, anesthesiology, and internal medicine and Defendants approved claims for these services.

**B.    Claudine Castillo**

61.    Plaintiff Claudine Castillo is a resident of Solano County, California.

62.    Ms. Castillo and her 16-year-old son have been enrolled in the Blue Shield San Francisco Health Service System Trio HMO plan since 2022.

63.    Ms. Castillo is enrolled in her plan through her employer. When deciding between the insurance plans offered by her employer, she opted for this plan because they believed that Blue Shield offered more comprehensive coverage and better service than the other available insurer. She relied on Blue Shield's misrepresentations about the extent of coverage and the breadth of the provider network when she decided to enroll in this plan.

64.    Ms. Castillo pays a premium of approximately $80 per month for her insurance, and her employer pays an additional $1760 per month.

65.    In August 2025, Ms. Castillo's son told her that he was considering committing suicide. Desperate to find mental health care for him, she called Blue Shield for assistance in locating a provider in her area.

66.    Blue Shield referred her to Magellan, which administers mental health benefits for Ms. Castillo's plan. After contacting Magellan and explaining the type of care she was looking for, she received a list of four providers that were supposedly in her area and accepting new patients. However, Ms. Castillo's calls to these providers revealed that two were not taking new patients. The other two never returned her calls.

67.    Ms. Castillo then contacted Magellan again to inform them that none of the providers they had previously listed were available. Magellan broadened its search radius to 25 miles from Ms. Castillo's home. This search yielded six providers, none of which were located in an area that Ms. Castillo or her son would be practically able to travel to on a regular basis.

68.    When Ms. Castillo informed Magellan that none of these providers were within reach, she was told that there were no other in-network providers in her area. Ms. Castillo asked what she should do when there are no available in-network providers in her area, and Magellan responded that she and her son would need to be willing to travel farther for care. Magellan did not make any offer

to cover the services and did not acknowledge to Ms. Castillo that they are legally required to cover services from an out-of-network provider when an in-network provider is not otherwise available.

69.    In addition to contacting Magellan by phone for a list of providers, Ms. Castillo also consulted Blue Shield's website, which gave her the same list of providers that were not actually available in her area.

70.    To date, Ms. Castillo has not been able to find in-network care for her son, despite the provider directory falsely listing multiple available in-network providers.

71.    Ms. Castillo relied on Defendants' marketing materials, website, provider directory, and plan documents when deciding to enroll in Defendants' plan and, once enrolled, to understand her benefits.

72.    When selecting her plan, Ms. Castillo relied on implicit and explicit representations by Defendants that the provider directory was robust and accurate, especially with respect to mental health providers.

73.    Over the same time period during which Defendants failed to supply in-network mental health providers within a reasonable distance of Ms. Castillo's residence, Ms. Castillo identified and received treatment from in-network providers within a reasonable distance for a variety of types of medical care including primary care and endocrinology.

**C.    Candyce Marto**

74.    Plaintiff Candyce Marto is a resident of San Bernardino County, California.

75.    Ms. Marto is enrolled in the Blue Shield TRIO HMO Per Admit 20-250. She and her husband, Kevin Maedel, have been enrolled in a Blue Shield HMO plan through his employer since 2000. She and her husband pay approximately $100 per month for their coverage.

76.    When deciding between the insurance plans offered by her husband's employer, she and her husband opted for this plan because they believed that Blue Shield offered more comprehensive coverage and better service than the other available insurer. She relied on Blue Shield's misrepresentations about the extent of coverage and the breadth of the provider network when she decided to enroll in this plan.

77.     After enrolling in the plan, Ms. Marto began searching for an in-network mental health provider for regular talk therapy. She found the options to be extremely limited, and was only able to find one provider who was actually in-network and available to see new patients. After a few initial sessions, it became clear that his therapeutic methodology was not well-suited to her needs.

78.     In 2022, after experiencing challenging medical issues, Ms. Marto decided to seek mental health care again. When she attempted to search for a provider using the Blue Shield online directory, she was redirected to the Magellan directory. There, she input her search criteria, and Magellan generated a list of hundreds of supposedly local, available, in-network providers.

79.     Once she began calling providers from the list, however, it became clear that the search was futile. Many of the providers she called did not answer the phone or return her calls. Others informed her that they were not actually accepting new patients, despite the fact that they were listed in the directory as doing so. Of the approximately 15 providers she contacted, none were available to provide care.

80.     Unable to locate an in-network provider and unable to afford out-of-network care for which her plan offers no coverage, she has gone without care for the last three years.

81.     Ms. Marto relied on Defendants' marketing materials, website, provider directory, and plan documents when deciding to enroll in Defendants' plan and, once enrolled, to understand her benefits.

82.     When selecting her plan, Ms. Marto relied on implicit and explicit representations by Defendants that the provider directory was robust and accurate, especially with respect to mental health providers.

83.     Over the same time period during which Defendants failed to supply in-network mental health providers within a reasonable distance of Ms. Marto's residence, Ms. Marto identified and received treatment from in-network providers within a reasonable distance for primary care, pulmonology, urology, and radiology services.

**D.    Kevin Maedel**

84.     Plaintiff Kevin Maedel is a resident of San Bernardino County, California.

85.     Mr. Maedel is enrolled in the Blue Shield TRIO HMO Per Admit 20-250. He and his wife, Candyce Marto, have been enrolled in a Blue Shield HMO plan through his employer since 2000. They pay approximately $100 per month for their coverage.

86.     When deciding between the insurance plans offered by his employer, he and his wife opted for this plan because they believed that Blue Shield offered more comprehensive coverage and better service than the other available insurer. He relied on Blue Shield's misrepresentations about the extent of coverage and the breadth of the provider network when he decided to enroll in this plan.

87.     Mr. Maedel has been searching for a therapist for the last five years. During these searches, Ms. Marto uses the Blue Shield and Magellan websites to generate a list of supposedly in-network, available providers, and Mr. Maedel then attempts to contact those providers to schedule an appointment. The vast majority of providers have never answered the phone or returned his calls. When a provider has returned his call, they have informed him that they were not accepting new patients, were not in-network with Blue Shield, did not offer in-person appointments, or did not have the specialized practice that the directory had listed. Each time Mr. Maedel has begun searching for mental health care, he has been unable to locate an available, in-network provider and has had to abandon his search for care.

88.     Mr. Maedel was looking for a therapist most recently in August 2025. Ms. Marto generated a list from the Magellan directory, and Mr. Maedel began contacting providers from the list. In total, he reached out to at least ten providers, but was not able to make an appointment with any of them because they did not return his calls, did not accept the insurance, or did not have any availability for new patients.

89.     Mr. Maedel has also been unable to locate an available, in-network psychiatric provider. Earlier this year, his primary care provider told him that they would be unable to continue prescribing the psychiatric medication that Mr. Maedel relies on and recommended that he find a psychiatrist to issue the prescription going forward.

90.     Together, Ms. Marto and Mr. Maedel began searching for an in-network psychiatrist through the Magellan directory, which they were directed to by Blue Shield. Ms. Marto generated a list of providers using the directory, then provided the list to Mr. Maedel to contact.

91.     In total, Mr. Maedel contacted more than 20 providers from the list, none of which were available to provide care. Many of the providers did not return his phone calls or were not accepting new patients.

92.     To date, Mr. Maedel has not been able to find an available, in-network provider for therapy or psychiatric care.

## II.     Defendants' Ghost Network

### A.     Blue Shield's Partnership with Magellan

93.     Blue Shield is a health care service plan under the Knox-Keene Act of 1975 ("Knox-Keene Act").

94.     For many of its plans, including ERISA and non-ERISA plans, Blue Shield partners with Defendant Magellan to administer behavioral health benefits.

95.     For these plans, Magellan serves as the plan's Mental Health Service Administrator ("MHSA"). Magellan is also a specialized health care service plan under the Knox-Keene Act. As described by Blue Shield in various Evidences of Coverage, as the MHSA Magellan will "administer" or "underwrite and deliver" Blue Shield's Mental Health and Substance Use Disorder services "through a unique network of MHSA Participating Providers."

### B.     Defendants' Plans and Mental Health Coverage

#### i.     Platinum Full PPO 0/10 OffEx Plan

96.     Blue Shield's Platinum Full PPO 0/10 OffEx ("Platinum Full") Plan is an ERISA plan that offers members access to low-cost care when using an in-network provider. Both individual and family members have no deductible for in-network care, but have a $1,000 individual and $2,000 family medical deductible for out-of-network care. The plan has an annual out-of-pocket maximum of $4,700 for individuals using in-network providers and $9,400 for a combination of in- and out-of-network providers.

97.     Members are responsible for a copay of $10 per visit for outpatient mental health office visits when the provider is in-network with Blue Shield's Mental Health Service Administrator.

98.     Other outpatient mental health services, including intensive outpatient care and behavioral health treatment for pervasive developmental disorders or autism, are subject to 10% coinsurance when provided by an in-network practitioner.

99.     For out-of-network behavioral healthcare, members must pay 40% coinsurance.

100.    The plan includes both inpatient and outpatient mental health coverage.

**ii.   TRIO HMO Basic Plan**

101.    The Blue Shield TRIO HMO Basic Plan is a non-ERISA plan offered by Blue Shield to some public employees of California pursuant to a contract between Blue Shield and the San Francisco Health Service System.

102.    The plan's annual out-of-pocket maximum for in-network medical costs is $1,500 for individuals and $3,000 for families.

103.    Outpatient mental health services require a $15 copay per visit. Coverage only applies to services received from in-network providers, and the plan offers no coverage for out-of-network providers.

104.    The plan includes both inpatient and outpatient mental health coverage.

**iii.   TRIO HMO Per Admit 20-250 Plan**

105.    The TRIO HMO Per Admit 20-250 ("TRIO HMO 20-250") Plan is a non-ERISA plan offered by Blue Shield to some public employees of California pursuant to a contract between Blue Shield and the Upland Unified School District.

106.    The plan has no deductible when using an in-network provider, but offers no coverage for out-of-network care. Individual coverage is subject to an annual out-of-pocket maximum of $2,000 for in-network care, while family coverage also has a separate $4,000 family maximum.

107.    For outpatient mental health services, members are responsible for a $20 copay per office visit, but only have coverage for providers that are in-network with the MHSA.

108. The plan includes both inpatient and outpatient mental health coverage.

**C.    Defendants' Provider Directories**

109. At all relevant times, Defendants published online directories of mental health providers who are supposedly in-network with Defendants, available to see new patients, and qualified to provide specified mental health services. These directories are the definitive resource to identify which providers are in Defendants' networks and are thereby covered at the plan's in-network rate. These directories are publicly available to members and non-members of Blue Shield plans.

110. The directory requires users to either search for a specific provider by name or select a specific specialty or condition for which they are seeking care. However, users must select from a set list of terms provided by Blue Shield, limiting the functionality of the directory. Without providing a doctor's name, specialty, or condition, a user cannot access the directory.

111. The Blue Shield directory allows the user to input their location and search radius, and can be sorted based on provider gender, clinical focus, and whether a provider is accepting new patients or offers virtual or in-person appointments.

112. For some insurance plans, if a user enters search terms suggesting a search for mental health care, Blue Shield redirects the user to Magellan's directory.

113. The Magellan directory allows the user to input their location and search radius, then allows for filtering search results by "Accepting New Patients," virtual or in-person visits, provider gender, specialty, and professional credentials, among other things.

114. Defendants' provider directories affirmatively misrepresent to current and prospective members that the mental health providers listed are in fact in-network and will be accessible and available to provide care. In reality, the vast majority of providers listed in the directories are not in-network, not available, not reachable, not qualified to provide the services listed for them, or not actually practicing at the listed location.

115. Moreover, Defendants' provider directories are replete with inaccuracies of all kinds, including incorrect addresses and phone numbers, as well as repeated entries of the same provider. These inaccuracies may appear at first glance to be a minor oversight, but such errors are far from

trivial for a person who needs mental health care for themself or a loved one. The inclusion of incorrect telephone numbers artificially inflates the perceived size and adequacy of Defendants' networks and forces members to invest more time and energy trying to find a mental health provider—only to be repeatedly led to a dead end.

116.    These inaccuracies make it appear that Defendants contract with vastly more mental health providers than they do. Accordingly, Defendants' provider directories, and representations about their comprehensive mental health coverage, are inaccurate, deceptive, and misleading.

**D.    "Secret Shopper" Study**

117.    In July 2025, Plaintiffs' counsel conducted a secret shopper study to replicate Plaintiff Jenniffer Roiz's experience trying to locate a provider. Counsel utilized experienced and qualified researchers to conduct this study.

118.    Using Defendant Magellan's online directory, Ms. Roiz generated a list of supposedly in-network mental health providers accepting new patients within a 25-mile radius of Santa Ana, California, where Ms. Roiz resides. This search yielded a list of 149 supposedly available, in-network providers.

119.    The research consultant then called each of the listed providers. If a call was not answered, the consultant would make a second attempt over multiple days and would leave a voicemail asking for a return call after each attempt. For every completed call, researchers recorded the provider's response: whether they were indeed the type of provider listed in the directory; whether they accepted Defendants' plan; whether the provider was accepting new patients; and how long the wait was for an appointment.

120.    Overall, only 13% of the listed providers were in-network, could be reached, provided the listed services, and were willing to schedule an initial appointment within one month.

121.    Out of the total 100 directory listings called, it was not possible to make an appointment with 87 of the providers listed. Fully 47 providers were unreachable—they never returned the calls or the phone number was incorrect or out of service. Of the 53 providers that were reachable, 40 did not accept the insurance plan, were not accepting new patients, did not provide the

necessary services, had no appointments available within one month, and/or were not practicing at the listed location.

122.    That is an 87% ghost rate for Magellan's mental health network.

## III.    Defendants' Deceptive and Misleading Activity

### A.    Defendants' Misrepresentations and Omissions

123.    Defendants hold themselves out to consumers—through the provider directories and marketing materials—as having robust networks of providers to meet members' mental health care needs. These representations are deceptive, as the directories misrepresent the breadth of the networks and the ease of utilizing the benefits available under the insurance plan.

124.    In addition to publishing and maintaining inaccurate provider directories, Defendants provide consumers with deceptive and materially misleading marketing and program materials about the benefits offered under their plans. These materials promise mental health benefits, easy access to care, and robust networks of providers. For example, in its Evidence of Coverage for the Platinum Full plan, Blue Shield states that "A Blue Shield health plan will help you pay for medical care and provide you with access to a network of doctors, Hospitals, and other Health Care Providers."[37]

125.    On a page titled "Blue Shield's network," Blue Shield says that "Our network of doctors and hospitals is designed to meet the needs of members . . . . A full selection of behavioral health providers for mental health care and substance use treatment are available. Additional specialists are included in our network if they meet our credentialing requirements to help make sure members have access to a larger number of doctors within a reasonable distance from home." This page then directs the user to Blue Shield's directory page to "Find a doctor."

126.    Defendants' representations about the size and breadth of their provider networks are grossly misleading because an estimated 76-92% of those listings are "ghosts." Defendants' networks are far smaller than advertised.

---

[37] Defendants also encourage members and prospective members to rely on Evidence of Coverage documents by stating that they should "read [the] Evidence of Coverage and Disclosure Form carefully and completely so that you understand which services are covered health care services, and the limitations and exclusions that apply to your plan."

127.    Defendants' directories are intentionally and grossly inaccurate, and consumers are often left struggling and wasting time searching for treatment long after they start to seek out a mental health professional. Consumers often have to seek help from costly out-of-network providers because Defendants' networks lack adequate providers.

128.    In its plan materials, Blue Shield repeatedly directs members to consult its directory and/or the directory of its MHSA to find in-network care. For example, as explained in the Evidence of Coverage for the Platinum Full plan, "Blue Shield contracts with Benefit Administrators to manage the Benefits . . . through their own network of providers," noting that mental health services are administered by the Mental Health Service Administrator. It goes on to encourage members to "Visit blueshieldca.com and click on Find a Doctor to access the MHSA network."

129.    On a page titled "Information about the provider directory," Blue Shield says that it "makes every attempt to validate the information in the directories." Blue Shield claims to validate information in its directory every three months, and credentials contracted providers every three years.

130.    Defendants mislead consumers by making them believe that they will have access to sufficiently broad networks of providers to meet their care needs and make use of the coverage provided by Defendants, when, in reality, Defendants' directories are inaccurate and their networks are sparse.

131.    Consumers rely on an insurer's directory to find providers in their health plan. As stated by the American Medical Association and the Council for Affordable Quality Healthcare:

> Health plans are expected by their members and their contracted practices to display a provider directory to the public that represents an accurate reflection of their networks. It is the most public-facing data that health plans provide, and patients are dependent on accurate directories to access care.[38]

132.    Blue Shield directs plan members to consult Defendants' directories in order to find in-network care. For plans that include mental health benefits administered by Magellan, Blue Shield also directs members to consult the Magellan directory to find in-network care. For example,

---

[38] Improving Health Plan Provider Directories, supra n. 26, at 7.

CLASS ACTION COMPLAINT

according to the Evidence of Coverage for the TRIO HMO Basic plan, Blue Shield of California contracts with a Mental Health Service Administrator to deliver all mental health services "through a unique network of mental health Participating Providers." The Evidence of Coverage requires that all mental health services be provided by a MHSA participating provider and states that "A list of MHSA Participating Providers is available in the online Blue Shield of California Provider Directory. Members may also contact the MHSA directly for information and to select a MHSA Participating Provider."

133.    Defendants' repeated focus on the importance of using an in-network provider, and repeated direction of members to use the provider directories to find an in-network provider, implies that members can rely on the directories to accurately reflect the pool of available, in-network providers. For example, Blue Shield encourages prospective TRIO HMO Basic plan members in its Evidence of Coverage to "review the list of providers within the Trio HMO physician and hospital directory before enrolling in this health plan."

134.    Defendants represent that they regularly monitor and update their network directories for accuracy. For example, Blue Shield represents that it updates its directory at least once every 90 days. Magellan's directory page for Blue Shield plans includes the date of the "Provider Directory Last Update," which is typically within one to two business days of the current date. In truth, Defendants' directories reflect ghost rates over 75%.

135.    Any argument by Defendants that the members should have themselves verified that the providers were in fact in-network does not absolve Defendants of their obligation to accurately represent the mental health providers available in their network.

136.    Any boilerplate disclaimers Defendants might provide would be woefully insufficient. Put another way, no reasonable consumer viewing a boilerplate disclaimer would understand that more than 75% of mental health providers listed in Defendants' directories are not available to treat members of Defendants' plans. Indeed, there is no disclaimer broad enough to absolve that level of deception.

137.    Defendants also misrepresent their willingness to allow members to see out-of-network providers at in-network rates when their networks are not adequate to meet members' care

needs. For example, the Evidence of Coverage for the Platinum Full plan explains members' rights when they cannot find in-network mental health care: "If you are unable to schedule an appointment with a Participating Provider for Mental Health and Substance Use Disorder services, contact Mental Health Customer Service. The MHSA will help you either schedule an appointment with a Participating Provider, or select a Non-Participating Provider in your area within five calendar days and contact you regarding available appointment times. For any Covered Services, you will be responsible for no more than the Cost Share for seeing a Non-Participating Provider." Similarly, according to the Evidence of Coverage for the TRIO HMO Basic plan, when in-network care is not available because "no MHSA Participating Provider is available to perform the needed service, the MHSA will refer you to a non-Plan Provider and authorize services to be received. If a Plan Provider is not available, the Member can ask to see a non-Plan Provider at the Plan Provider Cost Share. If the services cannot reasonably be obtained from a Plan Provider, Blue Shield will approve the request and the Member will only be responsible for the Plan Provider Cost Share." In the Evidence of Coverage for the SFHSS Trio HMO plan, Blue Shield states that when a member cannot find in-network mental health care, "The MHSA will help you either schedule an appointment with a Participating Provider, or select a Non-Participating Provider in your area within five calendar days and contact you regarding available appointment times. For any Covered Services, you will be responsible for no more than the Cost Share for using an MHSA Participating Provider."

138.    In its provider directory, Magellan misrepresents the network status of providers as well as other crucial information such as their availability to accept new patients, their contact information, the services they provide, and their locations. Members and prospective members rely on these representations to understand the availability of care within the Magellan network.

139.    Separately and together, Defendants' representations mislead consumers to believe that members will have access to a network of providers that is robust enough to allow them to utilize their comprehensive coverage with Defendants, and that they only need to look to and rely on the provider network to find necessary mental health care. In reality, Defendants' failure to maintain accurate directories makes it nearly impossible to obtain in-network mental health care.

140. The incorporation of the inaccurate directories into the plans' marketing materials through references to providers, services, and network on Defendants' public websites constituted a knowing untrue, deceptive, and misleading statement in connection with the marketing and sale of the plan.

141. In addition to the affirmative misrepresentations made by Defendants about the breadth of their provider networks and comprehensiveness of Defendants' mental health care coverage, Defendants also makes material omissions, including but not limited to their failure to disclose:

   a) the inadequacy of Defendants' networks to meet members' care needs;

   b) the extent of provider directory inaccuracies;

   c) that the vast majority of in-network mental health providers are not accessible;

   d) the likelihood that members will be unable to find an in-network mental health provider through the directories;

   e) the likelihood that members will need to delay or forgo coverage, or resort to using an out-of-network provider; and

   f) the likelihood that members will be unable to use the coverage that their plan provides for in-network mental health care.

142. There is complete information asymmetry between Defendants and consumers: Defendants have an obligation under the law to access all the relevant information, including their own contracts with in-network providers, to determine whether providers are accurately listed, and to make regular updates to ensure accuracy. On the other hand, a member can only become aware of the extent of the directory inaccuracies after expending significant time and energy through trial and error, hours of calls, and extensive research. The information is not readily available to Plaintiffs and other consumers.

**B.    Defendants' Misrepresentations and Omissions Are Material**

143. Plaintiffs relied on Defendants' provider directories and representations regarding their provider networks when choosing their health plans. Consumers in general regularly rely on a

health plan's provider directory to inform their choice of health plan.[39] Over half of consumers in one poll identified provider choice as the most important non-financial consideration they make when selecting a health plan.[40] In another survey, participants were willing to pay higher premiums for the ability to continue seeing their existing provider and for a plan with a wider network of providers in their area.[41] And, in a Kaiser Family Foundation survey, 60% of non-group health insurance enrollees reported that having a choice of providers was either "very important" or "extremely important" to them.[42]

144.    Given the importance of the provider network to prospective members, Defendants' misrepresentations and omissions in their directories would influence the decision of a reasonable consumer—and did influence Plaintiffs' decisions—to enroll in Defendants' plans. The provider directories and network information are disseminated by the insurance company, which Plaintiffs and other consumers logically view as the authoritative source of information about their in-network providers, scope of coverage, and other plan policies.

145.    As a result of Defendants' misrepresentations and omissions, a reasonable consumer would understandably believe—and Plaintiffs did believe— that each provider listed in the provider directories as being in-network and available to see new patients actually was in-network with Defendants and accepting new patients. If a reasonable consumer were aware of the extent of the inaccuracies of Defendants' directories, the sparse nature of Defendants' provider networks, and the

---

[39] *See* Statista, *Most Important Considerations for Americans in Choosing a Plan from a Health Insurance Company as of 2016*, https://www.statista.com/statistics/654828/most-important-considerations-for-choosing-health-insurance-plan/.

[40] *See* Blumberg et al., *Factors Influencing Health Plan Choice among the Marketplace Target Population on the Eve of the Health Reform*, Urban Inst., 2 (Feb. 6, 2014), https://www.urban.org/sites/default/files/2024-05/hrms_decision_factors.pdf.

[41] Eline M. van den Broek-Altenburg & Adam J. Atherly, *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, Am. J. of Managed Care 26(7) (July 2020), https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment.

[42] Hamel et al., *Survey of Non-Group Health Insurance Enrollees, Wave 2*, Kaiser Family Foundation (May 2015), https://www.kff.org/health-reform/poll-finding/survey-of-non-group-health-insurance-enrollees-wave-2/ (finding a combined 60% of respondents consider choice of providers to be "extremely important" or "very important").

CLASS ACTION COMPLAINT

consequent difficulties that members face in accessing in-network care, they would not enroll in Defendants' plan. If Plaintiffs had been so aware, they would not have enrolled in Defendants' plan.

146.    Accordingly, Defendants' misrepresentations about their mental health provider networks and coverage are materially misleading to consumers.

### C.    Members' Reliance on Defendants' Misrepresentations and Omissions

147.    Plaintiffs had a range of choices when selecting health insurance plans. For example, public employees like Claudine Castillo and Kevin Maedel are able to select from a wide range of plans from multiple insurers during their employers' open enrollment period.

148.    In the absence of a qualifying event like a marriage, change in employment, or birth of a child, most consumers are not eligible to change insurance plans mid-year. As a result, consumers are locked into their selected plan for a full year and do not have an opportunity to switch to a different plan if they discover mid-year that their insurance company has not accurately represented its coverage.

149.    When selecting a plan, Plaintiffs relied on Defendants' representations that members would have access to in-network mental health care, that Defendants contract with an adequate network of providers to meet members' care needs, and that Defendants maintained accurate provider directories to enable members to locate in-network care.

150.    These misrepresentations about the size and breadth of the mental health provider network, the ease of finding mental health treatment by using the provider directories, the freedom to choose any listed in-network provider, the ability to control costs by seeing an in-network provider, and the comprehensive coverage of mental health care would induce a reasonable consumer—and did induce Plaintiffs—to choose the Blue Shield plans in which they enrolled.

### D.    Defendants Knew That Their Provider Directories Were Inaccurate and That Their Representations Regarding Their Networks Were Deceptive

151.    At all relevant times, Defendants have willfully and knowingly maintained inaccurate and inflated provider directories to induce consumers to enroll in their coverage and to hide their non-compliance with network adequacy standards.

152.    As discussed above, there are numerous studies documenting the prevalence of ghost networks, especially for mental health providers, as well as recent congressional inquiries.

153.    As one state senator put it, insurance companies have "known about this for a long time and they haven't done anything about it. It's difficult not to assume that this kind of barrier is intentional."[43] Several insurance companies have been successfully sued over the issue.[44]

154.    The sheer magnitude of the inaccuracies in Defendants' directories—as many as 92% of the mental health providers listed—can only be the product of knowing misconduct or willful blindness, particularly in light of Defendants' legal obligation to update and maintain the directories.

155.    As demonstrated by the secret shopper study discussed above, in July 2025, Defendants published false lists of mental health providers in California. Defendants falsely listed non-existent, unavailable, out-of-network, and irrelevant providers (*i.e.*, providers who do not provide the services specified in the directories).

156.    Defendants knew that members were having significant problems accessing in-network care. Members, including Plaintiffs, have repeatedly contacted Defendants to report these difficulties.

157.    Defendants are incentivized to maintain, generate, and continue to publish inaccurate directories to attract new enrollees, maintain current enrollees, and profit from enrollees' premiums while not actually providing the coverage that Defendants falsely represented that they provide.

158.    On information and belief, at all relevant times, Defendants fraudulently and intentionally maintained and published materially false directories of mental health providers in California to deceive current and prospective enrollees about the extent of their provider networks. These intentional and fraudulent misrepresentations were made for the enrichment of Defendants.

//

//

---

[43] Turban, *supra* n. 28.

[44] *See, e.g.*, *Anthem Resolves Calif. Provider Directory Error Case*, Bloomberg Law (Aug. 17, 2016), https://news.bloomberglaw.com/health-law-and-business/anthem-resolves-calif-provider-directory-error-case.

**IV. Defendants Have Been Enriched and Members Have Been Injured by Defendants' Misrepresentations and Omissions**

159.    Defendants' knowing misrepresentations about the breadth of their provider networks confer significant financial benefits on Defendants and, conversely, deprive plan members of the benefit of their bargain.

160.    Prospective plan members are more likely to enroll if they see their existing provider listed as in-network or if the list of in-network providers is robust. Masking their inadequate networks with inaccurate provider directories therefore allows Defendants to attract more customers and charge higher premiums—all unjustly boosting Defendants' profits. Indeed, the more customers who enroll in their plans, and the more they pay in premiums, the more Defendants profit. Likewise, every time a member delays or forgoes care after failing to locate an available in-network provider, Defendants evade their obligation to pay for that member's care, reducing costs.[45] Defendants also reduce costs by not having to expend resources creating and maintaining robust provider networks and accurate provider directories.

161.    Plaintiffs and others similarly situated have been grievously injured by Defendants' illegal conduct and the resulting inability to access necessary mental health treatment for themselves and their families.

162.    As a result of Defendants' illegal conduct, Plaintiffs and other class members have suffered grievous injury, including facing significant, years-long delays in receiving critical mental health care; having to pay an inflated premium for a worthless product; having to pay exorbitant fees for out-of-network care for themselves and their dependents; and being unable to find appropriate treatment or, alarmingly, any treatment at all.

163.    Defendants' misrepresentations and omissions are the direct and proximate causes of the harms Plaintiffs have endured. Had Defendants accurately represented their mental health care coverage, Plaintiffs—and countless other consumers—would not have enrolled in coverage with this company. By enrolling in one of the other health insurance plans available to them, Plaintiffs would

---

[45] *See* Alicia Atwood & Anthony T. Lo Sasso, *The Effect of Narrow Provider Networks on Health Care Use*, J. of Health Econ. (Dec. 2016), https://doi.org/10.1016/j.jhealeco.2016.09.007.

have had access to the care they were promised and saved thousands of dollars in out-of-pocket expenses—not to mention the countless hours and emotional expense they would have been saved.

164.    Moreover, Defendants' misrepresentations artificially inflated the market price of their product, causing Plaintiffs to pay more than they otherwise would have for premiums. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs suffered injury by paying insurance premiums but failing to receive commensurate benefits.

**CLASS ACTION ALLEGATIONS**

165.    This action is brought by Plaintiffs individually and on behalf of a class (the "Class") pursuant to Federal Rule of Civil Procedure 23. The Class includes all those who have purchased or enrolled in a Blue Shield plan in California at any point from 2019 through the date of class certification.

166.    Plaintiffs also seek certification of the following three Sub-Classes:

    **A.**    All Class members who are currently, or were previously, enrolled in any of Blue Shield's non-ERISA Plans in California at any point from four years prior to the filing of the complaint through the date of class certification.

    **B.**    All Class members who are currently, or were previously, enrolled in any of Blue Shield's ERISA Plans in California at any point from 2019 through the date of class certification.

    **C.**    All Class members who, during the class period, paid for out-of-network care from a provider listed as in-network on Defendants' provider directories or paid for out-of-network care when there was no available in-network provider with similar qualifications within a reasonable distance.

167.    Excluded from the Class are Defendants' officers, directors, employees, co-conspirators, and legal representatives, and any judge, justice, or judicial officer to whom the litigation is assigned.

168.    Plaintiffs reserve the right to amend or modify the Class and Sub-Class definitions.

169.    **Numerosity.** The Class as a whole and each of the three Sub-Classes consist of thousands of individuals and entities, and is thus so numerous that joinder of all members is

impracticable. The exact number and identity of Class members is unknown to Plaintiffs at this time but can be ascertained through appropriate discovery.

170.    **Commonality and predominance.** This action is appropriate as a class action because common questions of law and fact affecting the Class predominate over those questions affecting only individual members. Those common questions include, but are not limited to, the following:

a)    whether Defendants breached their contractual obligations by failing to provide the promised networks of providers and/or by failing to comply with ERISA, the No Surprises Act, the MHPAEA, and/or other statutes, regulations, and rules with which Defendants are contractually obligated to comply;

b)    whether Defendants' representations and/or omissions with respect to the plan were false or misleading under ERISA, California Insurance Code Section 790, California Business & Professions Code Section 17500, California Business & Professions Code Section 17200, and/or common law;

c)    whether Defendants' violations of law were willful and knowing;

d)    whether Defendants' mental health provider directories were inaccurate and/or inadequate;

e)    whether Defendants failed to disclose to members and prospective members that the provider directories were inaccurate and/or inadequate;

f)    whether a reasonable consumer would be misled by Defendants' acts and practices;

g)    whether Plaintiffs and Class members are entitled to receive specific types of relief such as actual damages, and the methodology for calculating those damages;

h)    whether Plaintiffs and Class members conferred a benefit on Defendants through enrollment in Defendants' Plans, payment of premiums, and not utilizing in-network providers or otherwise not obtaining mental health care; and

i)    whether equity and good conscience require restitution to Plaintiffs and Class members and/or the establishment of a constructive trust, and the amount of such restitution or constructive trust.

171.    **Typicality.** The claims asserted by Plaintiffs are typical of the claims of the Class. At all relevant times, Defendants' provider networks were inadequate and their provider directories were inaccurate, and all Class members' claims arise out of this common source of misrepresentations and omissions. Plaintiffs, like all Class members, were subject to deceptive and misleading representations and omissions found in Defendants' provider directories and other marketing and plan documents regarding the comprehensiveness of mental health coverage and the provider network. Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class members, and Plaintiffs and other Class members have been damaged by the same wrongdoing set forth in this Complaint.

172.    **Adequacy of representation.** Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of the Class members. Plaintiffs have retained counsel competent and experienced in class actions and health insurance and consumer protection litigation, who are competent to serve as Class counsel. Plaintiffs and their counsel will fairly and adequately protect the interest of the Class members.

173.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)    given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class member, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendants have committed against them;

b)    the prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for Defendants and burden the courts;

c)    when Defendants' liability has been adjudicated, claims of all Class members can be determined by the Court;

d)    this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

e)    without a class action, many Class members would continue to suffer injury while Defendants retain the substantial proceeds of their wrongful conduct; and

f)    this action does not present any undue difficulties that would impede its management by the Court as a class action.

174.    **Ascertainability.** The identities and addresses of Class members can be readily ascertained from business records maintained by Defendants, and/or self-authentication. The precise number of Class members, and their addresses, can be ascertained from Defendants' records. Plaintiffs anticipate providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

175.    Plaintiffs request that the Court afford Class members with notice and the right to opt out of any Class certified in this action.

**FIRST CAUSE OF ACTION**

**Improper Denial of Benefits under ERISA**

**(On behalf of all Plaintiffs and Class members who purchased or enrolled in an ERISA plan)**

176.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

177.    Plaintiff Roiz purchased and/or enrolled in an ERISA plan. She brings this count on her own behalf and on behalf of those similarly situated pursuant to 29 U.S.C. § 1132(a)(1)(B) for damages at law.

178.    Defendants were responsible for reviewing, processing, and making final decisions approving or denying Plaintiff's and Class members' requests and claims under the plan.

179.    Defendants improperly denied Plaintiff's and Class members' requests for coverage and reimbursement for health services covered under the terms of the plan and Defendants' agreements under the plan.

180.    Defendants improperly denied requests for coverage and reimbursement, in part, based on the faulty premise that in-network providers were available to provide the requested services.

181.    In reality, because of Defendants' ghost network, in-network providers within a reasonable distance of Plaintiff were unavailable to provide Plaintiff's requested services. This lack of providers—despite the false representations in Defendants' directories that numerous in-network providers were available to provide the requested services—denied Plaintiff the coverage and benefits due to her under the plan.

182.    Defendants improperly failed to provide the health coverage affirmed under the plan; failed to reimburse Plaintiff in accordance with the terms of the plan; and failed to accurately apply Plaintiff's expenditures to deductibles in accordance with the terms of the plan.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty under ERISA

**(On behalf of all Plaintiffs and Class members who purchased or enrolled in an ERISA plan)**

183.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

184.    Plaintiff Roiz purchased and/or enrolled in an ERISA plan. She brings this count on her own behalf and on behalf of those similarly situated pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3) for equitable relief and damages at law.

185.    Defendants are responsible for interpreting the plans they administer and formulating policies and guidance for beneficiaries under the plans. Defendants are also responsible for maintaining the accuracy of plan materials, including provider directories. Defendants are additionally responsible for making final and binding decisions about whether to approve coverage requested by plan members. As such, Defendants exercise discretionary authority with respect to the administration of the plans and the payment of plan benefits. Defendants are therefore ERISA fiduciaries as defined by 29 U.S.C. §§ 1002(21)(A) and 1104(a).

186.    As ERISA fiduciaries, and pursuant to 29 U.S.C. § 1104(a), Defendants have a duty of loyalty to plan participants and beneficiaries which requires them to discharge their duties "solely in the interests of the participants and beneficiaries" of the plans they administer and for the

"exclusive purpose" of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the plans.

187.    Defendants also owe plan participants and beneficiaries a duty of care, which requires them to act with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plan.

188.    Defendants violated their fiduciary duties of loyalty and care to Plaintiff and Class members by grossly inflating the size of their provider networks and exaggerating plan benefits in order to increase enrollment and profits. Defendants knew that beneficiaries would not receive the coverage and benefits falsely represented in plan materials, including the provider directories, but made these misrepresentations to enrich themselves at the expense of Plaintiff and Class members.

189.    Defendants also elevated their own financial interests above the interests of the plan participants and beneficiaries, by failing to pay the appropriate amounts to providers who Defendants classified as Authorized Service providers, thereby causing these plan participants and beneficiaries significant damages.

**THIRD CAUSE OF ACTION**

**False Statements & Representations under ERISA**

**(On behalf of all Plaintiffs and Class members who purchased or enrolled in an ERISA plan)**

190.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

191.    Plaintiff Roiz purchased and/or enrolled in an ERISA plan. She brings this count on her own behalf and on behalf of those similarly situated pursuant to 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), and 1149 for equitable relief and damages at law.

192.    Defendants, in connection with a plan or other arrangement that is a multiple employer welfare arrangement, made false statements and false representations of fact, knowing them to be false, in connection with the marketing or sale of the plan or arrangement, to Plaintiff, concerning the benefits provided by such plan or arrangement.

193.    Defendants knowingly listed providers in their directories who did not exist, were not in-network, provided services other than the services listed, were not accepting new patients, were not accessible, and/or were duplicates. These intentionally false and inflated provider listings constitute knowing false statements and false representations of fact concerning the benefits provided by the plan, in connection with the marketing or sale of Defendants' health insurance.

**FOURTH CAUSE OF ACTION**

**Parity in Mental Health Benefits under ERISA & MHPAEA**

**(On behalf of all Plaintiffs and Class members who purchased or enrolled in an ERISA plan)**

194.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

195.    Plaintiff Roiz purchased and/or enrolled in an ERISA plan. She brings this count on her own behalf and on behalf of those similarly situated pursuant to 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), and 1185a for equitable relief and damages at law.

196.    Defendants, in administering a group health plan that provides both medical and surgical benefits and mental health benefits, included financial requirements and treatment limitations applicable to mental health benefits that were more restrictive than those applied to substantially all medical and surgical benefits covered by the plan.

197.    Among the many ways in which Defendants created a disparity in benefits, Defendants failed to maintain adequate networks of mental health providers while maintaining adequate networks of medical providers within the same geographic area. When Plaintiff and Class members could not find in-network mental health care as a result of the inadequate network, Defendants denied requests to extend in-network cost-sharing benefits to available out-of-network providers to enable Plaintiff and Class members to access mental health care. Defendants did not apply such treatment limitations to claims for medical and surgical benefits because in-network providers for medical and surgical treatments were more widely available under Defendants' health insurance.

198.    By falsely representing the availability of in-network mental health providers and by not honoring their legal obligations to cover out-of-network providers at in-network cost-sharing rates when in-network care is not available, Defendants required Plaintiffs and Class members to disproportionately seek treatment from out-of-network providers and pay higher costs than those required of beneficiaries seeking medical and surgical benefits. This financial requirement was more restrictive for mental health benefits than for medical or surgical benefits.

## FIFTH CAUSE OF ACTION

### Breach of Contract

**(On behalf of all Plaintiffs and Class members who are public employees and purchased or enrolled in a non-ERISA plan through their employer)**

199.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

200.    A contract exists between Plaintiffs' employers and Defendant Blue Shield to provide health insurance benefits, including mental health benefits, to public employees.

201.    A contract exists between Plaintiffs' employers and Defendant Magellan to provide health insurance benefits, including mental health benefits, to public employees.

202.    Plaintiffs, as public employees receiving health insurance through their employment, are intended third-party beneficiaries of these contracts between the employers and Defendants. A motivating purpose of the employers and Defendants entering these contracts was for Plaintiffs to benefit from their contract, and Plaintiffs would in fact benefit from the contracts.

203.    Plan members, i.e. Plaintiffs and the Class members, are mentioned throughout the Contracts.

204.    The contracts require Defendants to comply with federal law, including, *inter* alia, sections 2799A–1, 2799A–2, 2799A–3, 2799A-4, 2799A-5, 2799A–7, and 2799A–8 of the Public Health Service Act; sections 716, 717, 718, 719, 720, 722, and 723 of the Employee Retirement Income Security Act of 1974; and sections 9816, 9817, 9818, 9819, 9820, 9822, and 9823 of the Internal Revenue Code of 1986.

205.    Defendants have breached the contracts by failing to contract with a sufficient number of mental health providers to allow members to access timely in-network mental health services.

206.    The Mental Health Parity and Addiction Equity Act, 42 U.S.C. § 300gg-26, incorporated into the Affordable Care Act via 45 C.F.R. 156.115, provides that mental health and substance use disorder benefits must not be provided on less favorable terms than medical and surgical benefits, specifically with respect to annual, aggregate, or lifetime limits on coverage, financial requirements, treatment limitations, and out-of-network coverage.[46] MHPAEA regulations provide that "all plan standards that limit the scope or duration of benefits for services are subject to the nonquantitative treatment limitation parity requirements. This includes restrictions such as geographic limits, facility-type limits, and network adequacy."[47]

207.    Defendants, in administering plans that provide both medical and surgical benefits and mental health benefits, included financial requirements and treatment limitations applicable to mental health benefits that were more restrictive than those applied to substantially all medical and surgical benefits covered by the plan.

208.    Among the many ways in which Defendants created a disparity in benefits, by falsely representing the scope of available in-network mental health providers, Defendants required Plaintiffs and Class members to disproportionately seek treatment from out-of-network providers and pay higher costs than required of beneficiaries seeking medical and surgical benefits. This financial requirement was more restrictive for mental health benefits than for medical or surgical benefits. Defendants did not apply such treatment limitations to claims for medical and surgical benefits because in-network providers for medical and surgical treatments were more widely available under Defendants' health insurance.

209.    Sections 2799A-5 of the Public Health Service Act, 720 of the Employee Retirement Income Security Act of 1974, and 9820 of the Internal Revenue Code of 1986 require health insurers

---

[46] 29 U.S.C. §1185a(a); 42 U.S.C. § 300gg-26(a).
[47] Ctrs. for Medicare & Medicaid Services, *The Mental Health Parity and Addiction Equity Act* (2023), https://www.cms.gov/marketplace/private-health-insurance/mental-health-parity-addiction-equity; *see also* 29 C.F.R. 2590.712(c)(4).

to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when they are unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

210.    Defendants' failure to maintain accurate directories of in-network providers violates the requirements in the Employee Retirement Income Security Act and Internal Revenue Code, and was thus a breach of the contracts between Defendants and Plaintiffs' employers.

211.    Defendants have violated the above laws (and, by extension, their contractual obligations to Plaintiffs and the Class) by, among other things, failing to ensure mental health network adequacy and failing to provide accurate provider directories.

212.    These breaches have directly and proximately caused Plaintiffs and Class members significant harm, including monetary and non-monetary losses. Among other injuries, Defendants' breaches have caused millions of dollars in damages; denied Plaintiffs the benefits to which they were entitled under their health plans and for which they paid premiums (most notably, coverage for in-network mental health care and access to the supposedly broad networks of available providers); forced Plaintiffs and Class members to delay and/or forgo crucial and necessary mental health care; caused Plaintiffs and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members to incur significant out-of-pocket expenses for out-of-network provider payments, which greatly exceed the costs Plaintiffs would have incurred for the same services from in-network providers; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; induced Plaintiffs and Class members to enroll in Defendants' plan instead of better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress due to the unsuccessful provider search and their inability to receive treatment for themselves and their loved ones.

//
//
//
//

**SIXTH CAUSE OF ACTION**

**Breach of Contract**

**(On behalf of all Plaintiffs and Class members who purchased or enrolled in a non-ERISA plan)**

213.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

214.    Defendants and Plaintiffs have a direct contractual relationship. The terms of that direct contractual relationship are governed by the insurance materials provided by Defendants.

215.    In their contracts with each enrollee, Defendants agree to provide coverage for in-network mental health care, to assist members in accessing in-network care via their directories, and to cover out-of-network services at the in-network rate when in-network care is not available and accessible to members.

216.    Defendants breached their contracts with Plaintiffs by failing to provide meaningful coverage for outpatient mental health services and by failing to update and convey accurate information about the providers listed in their directories. Because Defendants do not maintain accurate provider directories and do not contract with adequate networks of mental health care providers, it has been impossible for Plaintiffs to locate in-network care and therefore make use of the coverage supposedly provided.

217.    Defendants breached their contracts with Plaintiffs by failing to adhere to promises in the Evidences of Coverage that Defendants would assist members in identifying appropriate out-of-network providers and approve and authorize members to receive services from those providers at in-network cost-sharing levels when in-network care is not available.

218.    These breaches have directly and proximately caused Plaintiffs and Class members significant harm, including monetary and non-monetary losses. Among other injuries, Defendants' breaches have caused millions of dollars in damages; denied Plaintiffs the benefits to which they were entitled under their health plans and for which they paid premiums (most notably, coverage for in-network mental health care and access to the supposedly broad networks of available providers); forced Plaintiffs and Class members to delay and/or forgo crucial and necessary mental health care;

caused Plaintiffs and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members to incur significant out-of-pocket expenses for out-of-network provider payments, which greatly exceed the costs Plaintiffs would have incurred for the same services from in-network providers; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; induced Plaintiffs and Class members to enroll in Defendants' plan instead of better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress due to the unsuccessful provider search and their inability to receive treatment for themselves and their loved ones.

## SEVENTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (On behalf of all Plaintiffs and Class members who purchased or enrolled in a non-ERISA plan)

219.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

220.    Plaintiffs and Defendants have a direct contractual relationship.

221.    The contract includes an implied covenant that Defendants will act in good faith and deal fairly with Plaintiffs.

222.    Plaintiffs did all of the significant things that the contract required of them. All conditions required for Defendants' full performance of the contract were met.

223.    Defendants materially breached the implied covenant in several respects, including but not limited to the following:

    a)    Defendants have failed to make a good-faith effort to maintain accurate and updated provider directories;

    b)    Defendants have failed to maintain, and failed to make a good-faith effort to maintain, adequate networks of providers;

    c)    Defendants have presented providers as being in-network and available to see new patients that were not, in fact, in-network and available to see new patients;

d)  Defendants have failed to support Plaintiffs in locating accessible, in-network care;

e)  Defendants have required Plaintiffs to pay out-of-network rates for care that was required to be covered at in-network rates due to deficiencies in Defendants' networks; and

f)  Defendants have denied claims and/or failed to pay claims for providers that were listed as in-network in the directories.

224.    By engaging in the above-listed activities, Defendants did not act fairly or in good faith.

225.    Defendants' breaches were conscious and deliberate acts, which were designed to and did unfairly frustrate the agreed common purposes of the contract and which disappointed Plaintiffs' and the Class's reasonable expectations by denying Plaintiffs and the Class the benefits of the contract.

226.    These misrepresentations have directly and proximately caused Plaintiffs and Class members significant harm, including monetary and non-monetary losses. Among other injuries, Defendants' misrepresentations have caused millions of dollars in damages; denied Plaintiffs the benefits to which they were entitled under their health plans and for which they paid premiums (most notably, coverage for in-network mental health care and access to the supposedly broad networks of available providers); forced Plaintiffs and Class members to delay and/or forgo crucial and necessary mental health care; caused Plaintiffs and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members to incur significant out-of-pocket expenses for out-of-network provider payments, which greatly exceed the costs Plaintiffs would have incurred for the same services from in-network providers; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; induced Plaintiffs and Class members to enroll in Defendants' plan instead of better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress due to the unsuccessful provider search and their inability to receive treatment for themselves and their loved ones.

**EIGHTH CAUSE OF ACTION**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(On behalf of all Plaintiffs and Class members who are public employees and purchased or enrolled in a non-ERISA plan through their employer)**

227.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

228.    A contract exists between Plaintiffs' employers and Defendant Blue Shield to provide health insurance benefits, including mental health benefits, to public employees.

229.    A contract exists between Plaintiffs' employers and Defendant Magellan to provide health insurance benefits, including mental health benefits, to public employees.

230.    Plaintiffs, as public employees receiving health insurance through their employment, are intended third-party beneficiaries of these contracts between the employers and Defendants. A motivating purpose of the employers and Defendants entering these contracts was for Plaintiffs to benefit from their contract, and Plaintiffs would in fact benefit from the contracts.

231.    Plan members, i.e. Plaintiffs and the Class members, are mentioned throughout the Contracts.

232.    The contracts include an implied covenant that Defendants will act in good faith and deal fairly with Plaintiffs.

233.    Plaintiffs did all of the significant things that the contract required of them. All conditions required for Defendants' full performance of the contract were met.

234.    Defendants materially breached the implied covenant in several respects, including but not limited to the following:

    a)    Defendants have failed to make a good-faith effort to maintain accurate and updated provider directories;

    b)    Defendants have failed to maintain, and failed to make a good-faith effort to maintain, adequate networks of providers;

    c)    Defendants have presented providers as being in-network and available to see new patients that were not, in fact, in-network and available to see new patients;

d)  Defendants have failed to support Plaintiffs in locating accessible, in-network care;

e)  Defendants have required Plaintiffs to pay out-of-network rates for care that was required to be covered at in-network rates due to deficiencies in Defendants' networks; and

f)  Defendants have denied claims and/or failed to pay claims for providers that were listed as in-network in the directories.

235.  By engaging in the above-listed activities, Defendants did not act fairly or in good faith.

236.  Defendants' breaches were conscious and deliberate acts, which were designed to and did unfairly frustrate the agreed common purposes of the contract and which disappointed Plaintiffs' and the Class's reasonable expectations by denying Plaintiffs and the Class the benefits of the contracts.

237.  These misrepresentations have directly and proximately caused Plaintiffs and Class members significant harm, including monetary and non-monetary losses. Among other injuries, Defendants' misrepresentations have caused millions of dollars in damages; denied Plaintiffs the benefits to which they were entitled under their health plans and for which they paid premiums (most notably, coverage for in-network mental health care and access to the supposedly broad networks of available providers); forced Plaintiffs and Class members to delay and/or forgo crucial and necessary mental health care; caused Plaintiffs and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members to incur significant out-of-pocket expenses for out-of-network provider payments, which greatly exceed the costs Plaintiffs would have incurred for the same services from in-network providers; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; induced Plaintiffs and Class members to enroll in Defendants' plan instead of better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress due to the unsuccessful provider search and their inability to receive treatment for themselves and their loved ones.

**NINTH CAUSE OF ACTION**

**Unfair Competition in Violation of California Business & Professions Code § 17200**

**(On behalf of all Plaintiffs and Class members)**

238.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

239.    Section 17200 of the California Business & Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

240.    Defendants have engaged in unfair competition by, among other things, engaging in fraudulent and deceptive advertising and business practices which are unlawful under California Business & Professions Code Section 17500, California Insurance Code Sections 790.02, 10133.15, and 10133.54, Sections 1367.03, 1367.27, and 1360 of the Knox-Keene Act, and Section 2240.01 of Chapter 10 of the California Code of Regulations.

241.    California Business & Professions Code Section 17500 prohibits false advertising by making it unlawful for a corporation to "make or disseminate or cause to be made or disseminated before the public" any untrue or misleading statement which the corporation knew or should have known to be untrue or misleading. It also prohibits such statements when made "as part of a plan or scheme with the intent not to sell" personal property or services "as so advertised."

242.    Defendants violated Business & Professions Code Section 17500 by disseminating untrue and misleading statements regarding providers' network status and availability and the mental health benefits included in their plans.

243.    California Insurance Code Section 790.02 prohibits unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, including making, issuing, or circulating a statement misrepresenting "the terms of any policy issued or to be issued or the benefits or advantages promised thereby" or a statement "which is untrue, deceptive, or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue, deceptive, or misleading."

48

CLASS ACTION COMPLAINT

244.    Defendants violated Insurance Code Section 790.02 by making false statements, which they knew or should have known to be untrue, deceptive, or misleading, regarding the availability of in-network mental health care and the mental health coverage provided by their plans.

245.    Section 1360 of the Knox-Keene Act prohibits health care services plans from using or permitting the use of advertising that is untrue or misleading, including any written or printed statement that is misleading "in any respect which is, or may be significant to an enrollee or subscriber, or potential enrollee or subscriber." This Section applies to Evidences of Coverage that cause a reasonable person "to expect benefits, service charges, or other advantages which the evidence of coverage does not provide or which the plan issuing such coverage or evidence of coverage does not regularly make available to enrollees."

246.    Defendants violated Section 1360 of the Knox-Keene Act by, among other things, making misleading statements in their written advertising materials and Evidences of Coverage that would cause a reasonable person to believe that their plans include access to an adequate network of mental health providers, coverage for in-network mental health care, and access to out-of-network mental health care at in-network cost-sharing rates when in-network care is unavailable.

247.    California Insurance Code Section 10133.15 and Section 1367.27 of the Knox-Keene Act require insurers and health care service plans to "publish and maintain" a provider directory "with information on contracting providers that deliver health care services" to the plan's members, "including those that accept new patients." This directory "shall not list or include information on a provider that is not currently under contract with the insurer" or plan. This directory must be made available online and upon request in hard copy to all members of the public. Insurers must update their directories "at least quarterly, or more frequently, if required by federal law," and "at least weekly . . . when informed of" updates from providers. Insurers are required to "take appropriate steps to ensure the accuracy of the information concerning each provider listed" and must investigate and rectify reported inaccuracies within 30 business days.

248.    Defendants violated Insurance Code Section 10133.15 and Section 1367.27 of the Knox-Keene Act by, among other things, failing to publish and maintain and accurate directory of mental health providers under their plans. Defendants' directories list an overwhelming percentage

of providers that, contrary to Defendants' representations, are not actually in-network, that are not accepting new patients despite being listed as doing so, and that do not have accurate contact information. Defendants do not take reasonable or appropriate steps to ensure the accuracy of the information listed in their directories. In fact, Defendants intentionally lie about the provider networks in order to induce people to enroll in their plans based on misinformation.

249.    California Insurance Code Section 10133.54 and Section 1367.03 of the Knox-Keene Act require health insurers and health care service plans to provide members with timely access to care by, among other things, establishing and maintaining a provider network that "has adequate capacity and availability of licensed health care providers to offer insureds" appointments for mental health care "within 10 business days of the request for appointment." When the insurer's network is inadequate to meet this standard, the insurer is required to "arrange for the provision of services outside the insurer's contracted network" at a cost to the member not exceeding "applicable in-network copayments, coinsurance, and deductibles."

250.    Defendants violated Insurance Code Section 10133.54 and Section 1367.03 of the Knox-Keene Act by failing to maintain adequate networks of providers to allow Plaintiffs and Class members to access mental health care within 10 business days of requesting an appointment. Instead, Plaintiffs were often unable to find any in-network providers with availability and encountered months-long wait lists for appointments when they did find providers that were actually in-network. When Plaintiffs alerted Defendants to their difficulties locating timely in-network care, Defendants did not arrange for Plaintiffs to receive out-of-network care.

251.    Section 2240.01 of Chapter 10 of the California Code of Regulations requires insurers to ensure that "there are mental health and substance use disorder professionals with skills appropriate to care for the mental health and substance use disorder needs of covered persons and with sufficient capacity to accept covered persons within a maximum travel time of 30 minutes or a maximum travel distance of 15 miles of each covered person's residence or workplace. The network must adequately provide for mental health and substance use disorder treatment, including behavioral health therapy." Within an insurer's network, "there must be mental health and substance use disorder providers of sufficient number and type to provide diagnosis and medically necessary

treatment through providers acting within their scope of license and scope of competence." Insurers must also ensure that their plan members can access information about their mental health benefits, providers, and other relevant information by contacting the insurer. When medically appropriate care is not available from a qualified, in-network provider, the insurer must "arrange for the required care with available and accessible providers outside the network, with the patient responsible for paying only cost-sharing in an amount equal to the cost-sharing they would have paid for provision of that or a similar service in-network."

252.    Defendants violated Section 2240.01 of Chapter 10 of the California Code of Regulations by, among other things, failing to ensure that they had adequate networks of qualified, available professionals to meet the needs to their plan members, failing to make accurate information about plan benefits and providers available to members, and failing to arrange for medically appropriate care from out-of-network providers when members notified them of a lack of available in-network providers.

253.    In addition to being unlawful, Defendants' misrepresentations of the coverage provided by their plans and the breadth of their provider networks constitute unfair and fraudulent business practices and deceptive advertising. Defendants encourage consumers to enroll in their plans using misleading statements about the availability of and coverage for in-network care, and continue to make misrepresentations to members after they have enrolled in a plan.

254.    Plaintiffs and other Class members relied on Defendants' false and deceptive advertising when deciding to enroll in coverage with Defendants.

255.    As a result of Defendants' unfair competition, Plaintiffs have suffered injury in fact and have lost money.

256.    These violations have directly and proximately caused Plaintiffs and Class members significant harm, including monetary and non-monetary losses. Among other injuries, Defendants' violations have caused millions of dollars in damages; denied Plaintiffs the benefits to which they were entitled under their health plans and for which they paid premiums (most notably, coverage for in-network mental health care and access to the supposedly broad networks of available providers); forced Plaintiffs and Class members to delay and/or forgo crucial and necessary mental health care;

caused Plaintiffs and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members to incur significant out-of-pocket expenses for out-of-network provider payments, which greatly exceed the costs Plaintiffs would have incurred for the same services from in-network providers; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; induced Plaintiffs and Class members to enroll in Defendants' plan instead of better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress due to the unsuccessful provider search and their inability to receive treatment for themselves and their loved ones.

257.    Plaintiffs are entitled to injunctive relief and restitution under California Business & Professions Code § 17200 as a result of these violations.

## TENTH CAUSE OF ACTION

### Intentional Misrepresentation

### (On behalf of all Plaintiffs and Class members)

258.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

259.    Insurance companies have statutory and common law obligations to provide accurate and complete information about their health care plans.

260.    Defendants made deceptive affirmative misrepresentations and omissions to Plaintiffs and Class members by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods. Defendants' misrepresentations were conveyed in Defendants' online provider directories and other marketing and publicly available materials. The provider directories themselves, on which Plaintiffs, as well as other members and prospective members, were directed to rely and did rely, intentionally inflated and misled them regarding the breadth and adequacy of the networks and the availability of mental health providers.

261.    The omissions from these same materials include, *inter alia*, any reference to the limited number of mental health providers who are actually in-network with Defendants, accepted Defendants' insurance, and were available to see new patients, and to the fact that members and

prospective members have to utilize out-of-network providers—and incur substantial costs—should they need mental health services.

262.    False representations include, *inter alia*, that Defendants have adequate networks of providers; that providers listed on the provider directories are in-network; that providers listed as accepting new patients actually accept new patients; that there are sufficient and available mental health care providers in that network; that members can rely on the directories to find and contact providers with the listed qualifications offering the listed services; that Defendants regularly update the directories; and that mental health care coverage is comprehensive.

263.    Omitted and concealed from the representations were material and relevant facts that Plaintiffs and Class members would have used in selecting their health insurance plans including, *inter alia*, the extent of inaccuracies in the provider directories; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to find appropriate mental health care.

264.    These misrepresentations and omissions were intended to, and did, induce reliance by Plaintiffs and Class members as to the services and benefits that would be delivered to them as a result of choosing Defendants' plan. Plaintiffs and Class members chose to enroll in Defendants' plan (instead of better, cheaper options) based on the lies Defendants told about their provider networks. And Plaintiffs and Class members detrimentally relied on Defendants' inaccurate directories when searching for in-network providers.

265.    Plaintiffs and Class members reasonably relied on Defendants' representations and omissions, as Defendants had unique knowledge of the facts underlying their representations.

266.    These fraudulent misrepresentations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that Defendants' provider directories were accurate and broad, and that mental health care would be covered to the full extent that Defendants had represented. A reasonable consumer would—and Plaintiffs and Class members did—attach importance to such representations and were induced to enroll in Defendants' health insurance plan as a result.

267.    These fraudulent misrepresentations and omissions alleged herein were intentional and materially misleading. Defendants intentionally led Plaintiffs and Class members to believe that their networks of available providers were adequate and robust in order to induce them to enroll in, and remain enrolled in, their plans. In reality, however, these misrepresentations and omissions prevented Plaintiffs and Class members from receiving promised care. Such deception was designed to, and did, allow Defendants to reap enormous financial gain through increased income (by way of premiums paid by Plaintiffs and Class members) and reduced costs (by way of delayed, forgone, and unreimbursed care and avoidance of the expenses that would be incurred by creating and maintaining robust provider networks and accurate provider directories).

268.    Defendants willfully and knowingly made the fraudulent misrepresentations and omissions alleged herein. Alternatively, Defendants made these intentional misrepresentations recklessly and without regard for their truth. Defendants, as parties to the contracts with in-network providers and as administrators of the provider networks, had access to all the information necessary to maintain accurate network directories. Likewise, Defendants continued to make the fraudulent misrepresentations and omissions even after Plaintiffs, other Class members, and other consumers notified Defendants of the inaccuracies in the directories and the difficulties members face when trying to locate in-network mental health care.

269.    Defendants' efforts to include affirmative misrepresentations and omissions in their marketing materials and provider directories was undertaken intentionally to induce individuals to choose their plan over other plans and to prevent them from obtaining covered care, thus increasing their profits.

270.    These misrepresentations have directly and proximately caused Plaintiffs and Class members significant harm, including monetary and non-monetary losses. Among other injuries, Defendants' misrepresentations have caused millions of dollars in damages; denied Plaintiffs the benefits to which they were entitled under their health plans and for which they paid premiums (most notably, coverage for in-network mental health care and access to the supposedly broad networks of available providers); forced Plaintiffs and Class members to delay and/or forgo crucial and necessary mental health care; caused Plaintiffs and Class members to pay inflated premiums for a virtually

worthless product; caused Plaintiffs and Class members to incur significant out-of-pocket expenses for out-of-network provider payments, which greatly exceed the costs Plaintiffs would have incurred for the same services from in-network providers; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; induced Plaintiffs and Class members to enroll in Defendants' plan instead of better and/or cheaper plans; prevented Plaintiffs and Class members from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress due to the unsuccessful provider search and their inability to receive treatment for themselves and their loved ones. Plaintiffs' reliance on Defendants' misrepresentations was a substantial factor in causing this harm.

## ELEVENTH CAUSE OF ACTION

### Negligent Misrepresentation

### (On behalf of all Plaintiffs and Class members)

271.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

272.    Insurance companies have a statutory and common law duty to provide accurate and complete information about their health care plans.

273.    Nevertheless, Defendants negligently misrepresented their provider networks and the availability of mental health providers for members because they failed to provide accurate information with regard to the breadth, qualifications, availability, identities, and contact information of providers in their networks.

274.    Defendants' false representations include, *inter alia*, that they have adequate networks of providers; that providers listed on the provider directories are in-network; that there are sufficient and available mental health care providers in that network; that providers listed as accepting new patients actually accept new patients; that members can rely on the directories to find and contact providers with the listed qualifications offering the listed services; and that mental health care coverage is comprehensive.

275.    Omitted and concealed from Defendants' representations were material and relevant facts that Plaintiffs and Class members used, and would have used in selecting their health insurance

plans, including, *inter alia*, the extent of inaccuracies in the provider directories; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures needed to find appropriate mental health care.

276.    Defendants had no reasonable grounds for believing the representations were true when they were made.

277.    These misrepresentations and omissions were intended to, and did, induce reliance by Plaintiffs and Class members as to the services and benefits that would be delivered to them as a result of choosing Defendants' plan. Plaintiffs and Class members chose to enroll in Defendants' plans (instead of better, cheaper options) based on the lies Defendants told about their provider networks. And Plaintiffs and Class members detrimentally relied on Defendants' inaccurate directories when searching for in-network providers.

278.    Plaintiffs and the Class reasonably relied upon the information that Defendants provided.

279.    Defendants have not used reasonable care or competence in providing accurate information about their networks of providers and in publishing their provider directories.

280.    These misrepresentations have directly and proximately caused Plaintiffs and Class members significant harm, including monetary and non-monetary losses. Among other injuries, Defendants' misrepresentations have caused millions of dollars in damages; denied Plaintiffs the benefits to which they were entitled under their health plans and for which they paid premiums (most notably, coverage for in-network mental health care and access to the supposedly broad networks of available providers); forced Plaintiffs and Class members to delay and/or forgo crucial and necessary mental health care; caused Plaintiffs and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiffs and Class members to incur significant out-of-pocket expenses for out-of-network provider payments, which greatly exceed the costs Plaintiffs would have incurred for the same services from in-network providers; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; induced Plaintiffs and Class members to enroll in Defendants' plan instead of better and/or cheaper plans; prevented Plaintiffs and Class members

from making informed financial and health care decisions; and caused Plaintiffs and Class members to suffer severe emotional and psychological distress due to the unsuccessful provider search and their inability to receive treatment for themselves and their loved ones.

281.    Plaintiffs' reliance on Defendants' misrepresentations was a substantial factor in causing this harm.

**TWELFTH CAUSE OF ACTION**

**Unjust Enrichment**

**(On behalf of all Plaintiffs and Class members)**

282.    Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

283.    Defendants have been and continue to be significantly and unjustly enriched as a result of their inaccurate provider directories and inadequate mental health provider network. Because they portrayed their provider networks as comprehensive, Plaintiffs and countless other individuals selected Defendants' plans over other plans, paid substantial premiums, and did not receive the coverage or care to which they were entitled. As a result, Defendants' market share and profits increased and their costs decreased, thus unjustly enriching them at Plaintiffs' and Class members' expense. Defendants' lies artificially inflated the price of, and induced Plaintiffs to enroll in, Defendants' plan, which increased the premiums paid to Defendants.

284.    Plaintiffs and Class members have conferred a benefit on Defendants by enrolling in their health insurance plans and thereby directing their medical premiums to Defendants.

285.    Plaintiffs and Class members have further conferred a benefit on Defendants because Defendants' inaccurate and inadequate networks force Plaintiffs and Class members to pay a portion of the mental health care expenses that Defendants represented would be covered. Effectively, Defendants represent that their insurance broadly covers mental health care, including care from providers listed in their directories, yet their bait-and-switch tactics ensure that they do not pay the full costs of actually covering mental health care services.

286.    Defendants have thus enriched themselves by reaping the benefits of increased membership, while reducing or eliminating their own coverage, reimbursement, and other financial

duties. This and other benefits were obtained at the expense of Plaintiffs and Class members, who did not receive the full value of what Defendants promised.

287.    In addition, Defendants' inflated mental health provider networks make it appear that they comply with federal and state statutory and regulatory requirements that their provider networks be sufficient, adequate, and accurate, thereby saving them the costs of actual compliance with these requirements—shielding them from government investigation, and the associated costs, at the expense of their members.

288.    An unjust enrichment cause of action is appropriate because Defendants failed to make restitution to Plaintiffs and Class members for the economic and non-economic harms, including out-of-pocket costs unjustly incurred, and more.

289.    It is inequitable and unjust for Defendants to retain the benefits from falsely portraying their provider networks in a way that increases enrollment while decreasing Defendants' obligations to do exactly what they say they will with respect to providing coverage for mental health treatment.

290.    These expenses and inconveniences should have been borne by Defendants. The profits made by Defendants as a result of their misconduct should be disgorged.

291.    Defendants must restore to Plaintiffs and Class members those premiums received from them and their employers. Plaintiffs are entitled to restitution of these funds because Defendants knew and had reason to know that they falsely portrayed their non-existent provider networks and the non-existent coverage available under their plans, inducing Plaintiffs to enroll in the plans.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

a.    declaring that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the Class and Sub-Classes as requested herein, designating Plaintiffs as the Class Representatives, and appointing the undersigned counsel as Class Counsel;

b.    awarding all injunctive relief permitted by law or equity;

c.      awarding compensatory damages, restitution, disgorgement, and any other relief

permitted by law or equity;

d.      awarding statutory damages and penalties in addition to actual damages;

e.      awarding treble damages;

f.      awarding punitive damages in an amount deemed appropriate by the Court;

g.      awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

h.      awarding Plaintiffs reasonable attorneys' fees and costs; and

i.      awarding Plaintiffs and the Class such other relief as this Court may deem just and

proper under the circumstances.

* * *

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: November 19, 2025

**BEN TRAVIS LAW, APC**

By: /s/ *Ben Travis*
Ben Travis (SBN 305641)
4660 La Jolla Village Dr., Suite 100
San Diego, CA 92122
(619) 353-7966
ben@bentravislaw.com

**POLLOCK COHEN LLP**

By: /s/ *Steve Cohen*
Steve Cohen (*pro hac vice forthcoming*)
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Scohen@PollockCohen.com

**WALDEN MACHT HARAN & WILLIAMS LLP**

By: /s/ *Jacob Gardener*
Jacob Gardener (*pro hac vice forthcoming*)
250 Vesey St., 27th Floor
New York, NY 10281
(212) 335-2965
jgardener@wmhwlaw.com

**ATTESTATION OF FILER**

I, Ben Travis, am the ECF user whose ID and password are being used to file this document.

In compliance with Civil L.R. 5-1(i)(3), I hereby attest that all counsel have concurred in this filing.

Dated: November 19, 2025                    /s/ *Ben Travis*
                                             Ben Travis