United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFFER ROIZ, et al.,<br>Plaintiffs,<br>v.<br>BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY, et al.,<br>Defendants. | Case No. 25-cv-09978-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** |

Plaintiffs Jenniffer Roix, Claudine Castillo, Candyce Marto, and Kevin Maedel (together, "plaintiffs") bring this putative class action against defendants California Physicians' Service d/b/a Blue Shield of California ("Blue Shield"), Magellan Health, Inc., Magellan Healthcare, Inc., and Human Affairs International of California (together, "Magellan"). Plaintiffs allege that the defendants have been misleading consumers "by publishing a grossly inaccurate directory of [mental health] doctors and therapists" in violation of state and federal law. First Amended Complaint ("FAC") [Dkt. No. 48] ¶ 1. Defendants now move to dismiss plaintiffs' complaint under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). For the reasons set forth below, defendants' motions to dismiss are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The following facts are alleged in the FAC. Blue Shield operates health insurance plans, including some through employers that fall under the purview of the Employee Retirement Income Security Act of 1974 ("ERISA"). FAC ¶¶ 128-40. Blue Shield also contracts directly with subscribers, with non-ERISA employers, and with government entities, providing multiple options for individuals to enroll in its health care coverage. To provide mental health services to its subscribers, Blue Shield contracts with Magellan Health Inc., Magellan Healthcare, Inc., &

Human Affairs International of California ("Magellan"). *Id.* ¶¶ 121-25. It is Blue Shield's mental health services that are at issue here.

The plaintiffs, all Blue Shield subscribers, allege that each relied upon Blue Shield's representations of their extensive provider network when enrolling in health coverage, and that Blue Shield's provider network for mental health services (as allegedly managed by Magellan) was insufficient and inadequately maintained, among other deficiencies, which lead to plaintiffs, subscribed across a variety of Blue Shield plans, either not receiving care for mental health issues or having to pay for their care out-of-pocket. As such, plaintiffs bring thirteen claims against the defendants on behalf of two plaintiff groups—namely, (i) those who purchased or enrolled in a non-ERISA plan ("non-ERISA group") and (ii) those with ERISA plans ("ERISA group")—in a class action against Blue Shield and Magellan. Within the non-ERISA group, plaintiffs also identify a subgroup of plaintiffs who are "public employees and purchased or enrolled in a non-ERISA plan through their employer."

## I. The Named Plaintiffs

### A. Claudine Castillo (representing non-ERISA group)

Through her employer, Ms. Castillo "and her 16-year-old son have been enrolled in the Blue Shield San Francisco Health Service System Trio HMO plan since 2022." FAC ¶¶ 71, 72. "Ms. Castillo pays a premium of approximately $80 per month for her insurance, and her employer pays an additional $1,760 per month." *Id.* ¶ 75.

Ms. Castillo relied on Blue Shield's misrepresentations "made in Defendants' marketing materials, website, provider directory, and plan documents," *id.* ¶ 73, about the breadth of the provider network, including for mental health care, when she decided to enroll in the [Trio HMO plan]." *Id.* ¶ 72. "Several months after enrolling in her Blue Shield plan," Ms. Castillo sought out a psychiatrist for herself. Ms. Castillo called Blue Shield, who referred her to Magellan, and asked for a list of in-network psychiatrists near her home." Magellan sent her a list of providers that "were unreasonably far away—over an hour by car from her home." She informed Magellan that the providers were too far away so Magellan sent her a list with providers that were 45 minutes away. She called all 14 providers on the list and found that "all providers were out of network,

were unavailable to treat her, or did not offer the services she required." *Id.* ¶ 77. She gave up trying to find a psychiatrist and went without mental health support for two years. *Id.*

In May of 2024, she tried again to find a psychiatrist. *Id.* ¶ 79. She called Blue Shield and was referred once again to Magellan. *Id.* Magellan sent her a list of providers that were over an hour from home. *Id.* She called again to find a provider within a reasonable distance and was given a provider with "an address near her home." *Id.* ¶ 80. She has seen this psychiatrist regularly "but has only seen him three times in person since his primary office was not located at the address listed in the directory and is not near her home." *Id.*

"In August 2025, Ms. Castillo's son told her that he was considering suicide." *Id.* ¶ 82. She "called Blue Shield, who referred her to Magellan, told them that her son was suicidal, and asked for assistance in locating an available provider in her area." *Id.* Magellan again sent lists of providers who were over an hour by car from her home. *Id.* ¶ 83. These would have been logistically impossible for them to attend in person given her son's school schedule and her work schedule. *Id.* She tried the providers within 45 minutes of her home who were allegedly taking new patients but "all were out of network, were unavailable to treat her son, or did not offer the services that Ms. Castillo's son required." *Id.* ¶ 84.

In October 2025, Ms. Castillo tried again to call Magellan for a list of providers. *Id.* ¶ 85. The list was of providers more than an hour from her home by car. *Id.* She tried once more and got the same list. *Id.* She asked during the call if she could have her son see someone out of network because there were no in network providers within a reasonable distance. *Id.* ¶ 86. "The representatives told Ms. Castillo that there was nothing more they could do besides send the provider directory." *Id.*

She also tried looking online instead of calling in December 2025. *Id.* ¶ 88. "Many of the providers she called months earlier who did not have availability were listed in Defendants' directory as accepting new patients." *Id.* She thought the directory had likely been updated since she had talked to Magellan. *Id.* However, calling these providers again, she found they still had no availability. *Id.* "Ms. Castillo informed Magellan representatives that many providers listed in the directory as available actually had no availability." *Id.* Magellan did not correct the online

United States District Court
Northern District of California

directory. *Id.* "To date, Ms. Castillo has not been able to find in-network care for her son, even though the provider directory falsely lists multiple available in-network providers." *Id.* ¶ 89.

"Ms. Castillo found Blue Shield's directory of medical and surgical providers to be much more reliable and accurate than Defendants' directory of mental health providers," and she was able to "identify and receive treatment from in-network providers within a reasonable distance for a variety of types of medical care, including primary care, endocrinology, and podiatry." *Id.* ¶¶ 90-91.

**B. Candyce Marto & Kevin Maedel (representing non-ERISA group)**

Candyce Marto and Kevin Maedel are a married couple who are enrolled in Blue Shield's TRIO HMO Per Admit 20-250 through Mr. Maedel's employer, and they "pay approximately $100 per month for their coverage." FAC ¶ 94, 109. They "opted for this plan because they were led to believe that Blue Shield offered the best coverage of the options available" and "relied on Defendants' misrepresentations about the breadth of the provider network," "made in Defendants' marketing materials, website, provider directory, and plan documents[,] when deciding to enroll. *Id.* ¶¶ 95, 99, 110-11. They also referred to these documents to understand their benefits once enrolled and understood the defendants' provider directory to be "robust and accurate, especially with respect to mental health providers." *Id.* ¶¶ 99-100, 111-12.

In 2022, Ms. Marto sought out a therapist. *Id.* ¶ 101. She looked on Blue Shield's website, which sent her to a "provider directory hosted on Magellan's website." *Id.* "There, she input her search criteria, and Magellan generated a list of hundreds of supposedly nearby, available, in-network providers." *Id.* However, "all 15 providers she called were out of network, were unavailable to treat Ms. Marto, or did not offer the services listed in the directory." *Id.* ¶ 102. She has not been able to locate an in-network provider and cannot afford out of network care. *Id.* ¶ 103. "She has gone without care for the last four years."

Similarly, Mr. Maedel has struggled to find "a therapist for the last several years using the provider directory." *Id.* ¶ 113. In 2024, after the couple failed to locate a therapist for Mr. Maedel using the Blue Shield and Magellan provider directories, Mr. Maedel's PCP referred him to a therapist. *Id.* ¶¶ 113-14. However, the PCP referral was not a good match as "[t]hat therapist

turned out to work at a substance abuse-focused practice, and Mr. Maedel has no substance abuse problems." *Id.* ¶ 114. The PCP could offer no further referrals and "told Mr. Maedel to look on Blue Shield and Magellan's website," which deterred him from taking further action to find a therapist because he was "insulted and hurt by this experience." *Id.* ¶¶ 114-15.

In summer 2025, Mr. Maedel again searched for a therapist. *Id.* ¶ 116. "Ms. Marto helped him generate lists of providers" "within twenty miles of their home who were accepting new patients" "from the Magellan website, then sent him those lists." *Id.* ¶ 116. "Mr. Maedel spent five hours researching providers," then "calling and leaving voicemails" at their offices to try and obtain care, but "contrary to the representations in the directory, all the providers he called were out of network, were unavailable to treat him, or did not offer the services listed." *Id.* ¶¶ 116-17. Despite contacting "more than 20 providers listed in the directory," "Mr. Maedel has not been able to find an available, in network provider for mental health care," and as such, "has gone without care for two years." *Id.* ¶¶ 118-19.

**C. Jenniffer Roiz (representing ERISA group)**

"Roiz has been enrolled in the Blue Shield Platinum Full PPO 0/10 OffEx plan since August 2024," and "pays a premium of approximately $200 per month for her insurance." *Id.* ¶¶ 51, 55. "[S]he selected the Platinum plan because it offered $0 co-payment for in-network mental health services and Ms. Roiz believed she would be able to access the robust network of mental health care providers listed in the provider directory based on Defendants' representations of the provider network" "made in Defendants' marketing materials, website, provider directory, and plan documents when deciding to enroll in the Blue Shield plan; and, once enrolled, to understand her benefits." *Id.* ¶¶ 52-53.

While Ms. Roiz's existing therapist appeared to be within Blue Shield's network, "her therapy claims were being denied." *Id.* ¶¶ 56-57. When she contacted Blue Shield via telephone "a representative told Ms. Roiz that her therapist was not in-network," and transferred her to a Magellan representative who "told Ms. Roiz that her existing therapist would be covered for three months with in-network pricing but after that, she would need to find an in-network therapist." *Id.* ¶ 58. "Although Defendants' provider directory represented that there were in-network therapists

located nearby who were taking new patients, when Ms. Roiz began calling those providers from the directory, she was unable to find a provider who was in-network and accepting new patients." *Id.* ¶ 59. "Contrary to the representations in the directory, all [ten] providers she called were out of network, were unavailable to treat Ms. Roiz, or did not offer the services listed." *Id.* ¶ 60.

At that point, "Ms. Roiz called Blue Shield's mental health line (which was operated by Magellan) to submit an Access Complaint," describing to defendants "her difficulty locating an available in-network provider" in the directory. The representative "initially referred Ms. Roiz back to the directory," but when told that was the source of the issue, "offered to send Ms. Roiz a hard copy" of the directory. *Id.* ¶ 61. When Ms. Roiz "received the hard copy, she confirmed it was the same as the inaccurate online directory she had referenced initially," which was "devastat[ing]" to her as someone "experiencing severe post-partum depression and grief during this time." *Id.* "Defendants did not offer to find Ms. Roiz an available provider within ten business days as required by her contracts," nor did they "offer to extend the three-month period of coverage for her existing therapist at an in-network rate when they learned she had been unable to find an in-network provider through the provider directory, also required by her contracts," nor did they follow-up with Ms. Roiz "regarding her inability to find in-network care based on the inaccurate representations in the provider directory." *Id.* ¶ 62. Due to these difficulties in accessing care within Blue Shield's network, "Ms. Roiz continued to see her existing therapist, paying $150 out-of pocket per weekly session" until she was no longer able to afford the expense and discontinued therapy entirely. *Id.* ¶ 63.

Despite her experience with Blue Shield's inadequate mental health coverage, Ms. Roiz re-enrolled in her plan in 2025 "because, among other reasons, she developed critical relationships with in-network, non-mental-health-care providers who understood her medical needs." *Id.* ¶ 64. However, in 2026, when Ms. Roiz "resumed her search for an in-network therapist," she found after calling six of the mental health providers listed as in-network and taking new patients in Blue Shield's provider directory that, again, none were available. *Id.* ¶ 65. In contrast, Blue Shield's directory allowed Ms. Roiz to easily "identify and receive treatment from in-network providers within a reasonable distance for a variety of types of medical care—including primary care,

gastroenterology, and gynecology—without long wait times." *Id.* ¶ 67.

## II. First Amended Complaint

Together, plaintiffs assert thirteen causes of action against Magellan and Blue Shield: (1-3) Breach of Contract; (4-6) Breach of the Implied Covenant of Good Faith and Fair Dealing; (7) Unfair Competition in Violation of California Business and Professions Code § 17200; (8) Intentional Misrepresentation; (9) Negligent Misrepresentation; (10) Restitution for Unjust Enrichment; (11) Improper Denial of Benefits in Violation of ERISA (29 U.S.C. § 1132(a)(1)(B)); (12) Breach of Fiduciary Duty Under ERISA (29 U.S.C. §§ 1109(a), 1132(a)(2) & (a)(3)); and (13) Violation of the Parity Under ERISA and the Mental Health and Substance Use Disorder Benefits Act ("Parity Act") (29 U.S.C. §§ 1132(a)(1)(B), (a)(3), and 1185(a) (against Blue Shield only). *See generally* FAC. Bringing suit under Federal Rule of Civil Procedure 23, plaintiffs also seek to certify three plaintiff sub-classes, categorized as:

> A. All Class members who are currently, or were previously, enrolled in any of Blue Shield's non-ERISA Plans in California at any point from four years prior to the filing of the Complaint through the date of class certification.
> B. All Class members who are currently, or were previously, enrolled in any of Blue Shield's ERISA Plans in California at any point from November 19, 2021, through the date of class certification.
> C. All Class members who, during the class period, paid for out-of-network care from a provider listed as in-network on Defendants' provider directory or paid for out-of-network care when there was no available in-network provider with similar qualifications within a reasonable distance.

FAC ¶ 240. Plaintiffs request the remedies of damages, injunctive relief, restitution, attorneys' fees, and any "other relief as this Court may deem just and proper under the circumstances." FAC, Prayer for Relief (a)-(i).

Blue Shield moves to dismiss all eleven causes of action plaintiffs bring against it— causes of action 1, 2, 4, 5, and 7-13. Blue Shield Motion to Dismiss FAC ("BS Mot.") [Dkt. No. 50]. Magellan similarly moves to dismiss all eight counts plaintiffs bring against it—causes of action 3 and 6-12. Magellan Motion to Dismiss FAC ("Mag. Mot.") [Dkt. No. 52]. Plaintiffs opposed both motions in a single opposition brief. Opposition to Motion to Dismiss ("Oppo.") [Dkt. No. 56]. Defendants replied. Blue Shield Reply ISO BS Mot. ("BS Reply") [Dkt. No. 57]; Magellan Reply

ISO Mag. Mot. ("Mag. Reply") [Dkt. No. 58]. After argument of counsel, this motion is ready for resolution.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000), *overruled on other grounds*, *Singleton v. Gates*, No. 25-743, 2026 WL 1494029 (9th Cir. May 28, 2026). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

United States District Court
Northern District of California

## DISCUSSION

I have divided plaintiffs' causes of action into three groups—contract claims, ERISA claims, and other state law claims—and I will analyze in that order. The parties do not dispute that California law applies to the common law claims.

## I. Contract Claims: Non-ERISA Plaintiffs

Plaintiffs' causes of action 1-6 encompass claims for Breach of Contract (1-3) and Breach of Implied Covenant of Good Faith and Fair Dealing (4-6). Claims 1, 2, 4, and 5 are brought against Blue Shield and claims 3 and 6 are brought against Magellan. Claims 1 and 4 are brought by the non-ERISA group[1] for violations of their direct contractual relationships with Blue Shield. Claims 2 and 5 are brought by the non-ERISA group as third-party beneficiaries of Blue Shield's contracts with their employers. Claims 3 and 6 are brought against Magellan by the non-ERISA group as third-party beneficiaries of the contract between Blue Shield and Magellan. Whether the non-ERISA plaintiffs are third-party beneficiaries of either their employer's contract with Blue Shield or the contract between Magellan and Blue Shield is a threshold issue for the majority of the contract-related claims. I will turn to this question first.

### A. Third-Party Beneficiaries

Under California law, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559. "The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract." *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1022 (2009) (citations omitted). Specifically, the court will consider "the express provisions of the contract at issue, as well as all of the relevant circumstances under which the contract was agreed to, in order to determine not only (1) whether the third party would in fact benefit from the contract, but also (2) whether a motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) whether permitting a third party to bring its own breach of contract action against a contracting

[1] Plaintiffs recognize that these breach of contract claims would be preempted for the ERISA group.

party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 830 (2019). "Although a third party need not be expressly named or identified in a contract, a party must demonstrate 'that [it] is a member of a class of persons for whose benefit it was made.'" *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1161 (9th Cir. 2010) (citation omitted).

**1. Magellan – Blue Shield Contract**

Magellan contends that its contract with Blue Shield contains a third party exclusion clause which "unambiguously manifests an intent not to create any obligations to third parties." Mag. Mot. at 8 (quoting *Balsam*, 627 F.3d at 1163). The clause at issue states:

> 9.17 Third Party Beneficiaries. The parties do not intend to confer and this Agreement shall not be construed to confer any rights or benefits to any person, firm, group, corporation or entity other than the parties.

Ex. 1, Mag. Reply [Dkt. No. 58-1] at 53. Plaintiffs counter that third-party beneficiary exclusion clauses are "not dispositive" and note that the "contract refers to 'Members' and 'Enrollees' on nearly every page and states that Defendants 'desire that [Magellan] provide or arrange for the delivery of mental health … services, to Members.'" Oppo. at 14. Plaintiffs argue that "it is self - evident" that the contract is intended to benefit plaintiffs from this language and that allowing plaintiffs to sue is "necessary to effectuate the objectives of the contract" because Blue Shield financially benefits if Magellan breaches its contractual obligations. *Id.*

Magellan responds that while "Plaintiffs may be incidental beneficiaries, they are not intended beneficiaries" and that they can enforce their contractual rights against Blue Shield and Blue Shield can in turn enforce against Magellan. Mag. Reply at 4. Magellan asserts that the clear motivating purpose of the contract is to assist Blue Shield in "the performance of its obligations to its customers, not to enhance the benefits due to those customers." Mag. Reply at 4, and the contract contains explicit language that it "is not intended nor shall it be deemed or construed to modify the contractual obligations of BSC to Members," Mag. Reply at 5 (quoting Ex. 1).

A third-party exclusion clause is not dispositive if specific language elsewhere in the contract "trumps this clause." *Balsam*, 627 F.3d at 1161; *see also Oakland Bulk & Oversized*

*Terminal, LLC v. City of Oakland*, 112 Cal. App. 5th 519, 563-64 (2025), *review denied* (Sept. 17, 2025) ("[D]espite a 'No Third-Party Beneficiaries' provision, the [*Balsam*] court recognized that the issue of the parties' intent had to be analyzed on a case-by-case basis."). The contract's discussion of the services Magellan will provide for Blue Shield to its members did not expressly negate the disclaimer.

In *Oakland Bulk*, on which plaintiffs rely, the third party, OGRE, was permitted to sue to enforce the contract despite a no third-party beneficiary clause because it was clear that OGRE—who was explicitly acknowledged as the subtenant of the contracting party and had been subcontracted by the party for the same scope of work as the agreement—"was part of a vertical arrangement" recognized by both contracting parties, and was therefore entitled to enforce the contract." 112 Ca. App. 5th at 564 ("The City was aware of OGRE's role as the intended rail operator from the project's inception, including when the Development Agreement was signed in 2013 and later in 2016, when the Ground Lease was executed . . . . [T]he Ground Lease names OGRE as a subtenant, necessarily inferring that the parties anticipated OGRE could sue for breach of the Ground Lease. ). Here, there is no such vertical relationship between Blue Shield and its members and the main purpose of the contract is to allow Blue Shield to offer a comprehensive insurance product that includes mental health. The intended beneficiary of the contract is Blue Shield, not its members, and it is Blue Shield that will seek redress in the event the agreement is breached.[2] Plaintiffs are not intended third party beneficiaries to the Magellan-Blue Shield contract and may not sue for breach of its provisions. Claims 3 and 6 are dismissed on this basis.

[2] The plaintiffs point out that some of the provisions allow for members to submit emergency services care for reimbursement directly to Magellan. Oppo. at 14. That the contract describes how some of the services might work does not manifest an intent to delegate responsibility to the members to enforce this contract broadly. The contract expressly provides that *Blue Shield* is charged with monitoring Magellan's compliance with the contract and retains the right to overturn Magellan's decisions related to care or coverage with which it disagrees. Ex. 1, Mag. Reply at 11 ("HAI-CA acknowledges that BSC shall retain the right to overturn or reverse any utilization management determination made by HAI-CA in the performance of the delegated services hereunder including without limitation, the determination of the Medical Necessity of covered services, the determination as to which services are covered services, and the determination as to who is or is not a Member.. . . . HAI-CA acknowledges BSC's responsibility to monitor HAI-CA's compliance with the delegation criteria and standards and agrees to cooperate with BSC's monitoring of such compliance.").

**2. Blue Shield – Employer Contract**

Blue Shield also argues that plaintiffs are not properly third-party beneficiaries of the contract between their employers and Blue Shield. BS Mot. at 20. Plaintiffs contend that they are properly third-party beneficiaries because the primary purpose of the contract is to benefit them. Oppo. at 12 ("Indeed, the contracts state that 'Blue Shield agrees to provide Benefits of this Contract to covered Employees and their covered Dependents.'"). They note that there is also no explicit language disclaiming claims for third parties. Oppo. at 20-23.

Plaintiffs rely heavily on a California appellate case, *Baglione v. Health Net of California, Inc.*, 97 Cal. App. 5th 882, 891 (2023), where a court found an arbitration agreement not enforceable between a health insurance company and its enrollee. As part of the analysis, the court concluded that the employee was a third-party beneficiary of the contract between an employer and an insurance company. *Id.* at 892. The court noted that "an employer's agreement with a health plan is negotiated primarily for the benefit of the employees." *Id.*

Blue Shield tries to distinguish *Baglione* by stating that it is narrowly applicable in the statutory disclosure context. BS Reply at 12. This distinction is not persuasive. In *Baglione*, the court concluded that because the employees were beneficiaries of the contract that the employers were making, disclosure to the employers of the rights the employees would be giving up was required. 97 Cal. App. 5th at 892–93. This conclusion in no way suggests that the court's conclusion that group health benefits negotiated by an employer are for the benefit of the employees is limited to a disclosure context. The contract between Blue Shield and plaintiffs' employers is to provide health benefits to the employees. The plaintiffs are third-party beneficiaries of the employer contracts and can enforce violations of them.

**B. Breach of Contract Against Blue Shield**

As to claims 1 and 2, Blue Shield argues that plaintiffs have not pleaded breach of contract because they: (i)"fail to identify sufficiently definite contract terms," BS Mot. at 17-18; (ii) "do not sufficiently plead breach of any contract term," *id.* at 18-19; and (iii) "do not plausibly plead contract damages," *id.* at 19-20. Blue Shield further asserts that plaintiffs cannot plead bad faith under claims 4 and 5 (implied covenant of good faith and fair dealing) because they have not

alleged they were denied any benefits and the claims are duplicative of the "express contract claims." *Id.* at 20-21.

Plaintiffs argue that they have specified the contract terms that were breached in two categories: (1) the accuracy and effectiveness of the provider network and (2) access to care. Oppo. at 9-10. Plaintiffs assert that their implied covenant of good faith and fair dealing claims are not duplicative because they have adequately alleged bad faith which is beyond the contract terms. *Id.* at 16. They contend that they have to show that Blue Shield had a duty to provide benefits under the plan, not that they were denied benefits. *Id.* at 17.

**1. Direct Contracts**

**a. Provisions About Provider Networks**

Plaintiffs allege that their contracts with Blue Shield clearly point plaintiffs to Blue Shield's online provider directory to find current providers:

> i) "Visit blueshieldca.com and click on Find a Doctor to access the MHSA participating Provider Network."
> ii) "You can find Participating Providers in this network at blueshieldca.com"
> iii) "Visit blueshieldca.com or use the Blue Shield mobile app and click on Find Doctor for a list of the plan's Participating Providers."
> iv) If a provider leaves this plan's network, the status of the provider will change from Participating to Non-Participating."

FAC ¶¶ 149, 186–87, 191, 254. They further allege that "[o]n a page of its website titled 'Information about the provider directory,' Blue Shield says that it 'makes every attempt to validate the information in the directories.' Blue Shield claims to validate information in its directory at least once every 90 days and credential contracted providers every three years." *Id.* ¶ 192. Plaintiffs state that Blue Shield specifically breached these provisions "by publishing an inaccurate directory that greatly exaggerates the provider network" and "affirmatively ly[ing] about providers in order to create the appearance of a robust network." Oppo. at 9 (citing FAC ¶¶ 37, 144, 147, 223, 252-63).

**b. Provisions About Access to Care**

Plaintiffs also cite the following allegations around "access to care":

> i) "You have a right to receive timely and geographically accessible Mental Health/Substance Use Disorder (MH/SUD) services when you need them. If Blue Shield fails to arrange



United States District Court
Northern District of California

those services for you with an appropriate provider who is in the health plan's network, the health plan must cover and arrange needed services for you from an out-of-network provider. If that happens, you do not have to pay anything other than your ordinary in network cost-sharing." FAC ¶ 202.

ii) "[Blue Shield's Mental Health Service Administrator] will help you either schedule an appointment with a Participating Provider, or select a Non-Participating Provider in your area within five calendar days and contact you regarding available appointment times. For any Covered Services, you will be responsible for no more than the Cost Share for seeing a Non-Participating Provider." *Id.* ¶ 201.

iii) "[Y]our health plan must offer an appointment for you that is no more than 10 business days from when you requested the services from the health plan. If you urgently need the services, your health plan must offer you an appointment within 48 hours of your request (if the health plan does not require prior authorization for the appointment) or within 96 hours (if the health plan does require prior authorization)." *Id.* ¶ 203.

iv) "[W]hen you call for an appointment, you will see your provider within a reasonable timeframe." *Id.* ¶ 204.

v) "[Y]ou have the right to … reasonable access to appropriate medical and mental health services." *See, e.g.*, Dkt. No. 42-3 at 15.

Oppo. at 10. Plaintiffs allege that "Blue Shield breached these promises by failing to arrange for timely, geographically accessible care at in-network rates, even when repeatedly asked to do so." *Id.*

**c. Breach of Contract**

"In order to state a claim for breach of contract, a plaintiff must plead the existence of a contract, his performance of the contract or excuse for nonperformance, the defendant's breach and resulting damages." *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 930 (N.D. Cal. 2012). "The complaint must identify the specific provision of the contract allegedly breached by the defendant." *Id.* at 930.

There is no dispute here that a contract exists between plaintiffs and Blue Shield. The question is whether plaintiffs have pointed to specific contractual provisions and have adequately alleged violation of them. I agree with Blue Shield that the generic statements directing plaintiffs to go to Blue Shield's website and look at the network of providers generally do not provide contractual terms that were violated. *See* BS. Reply at 7. But plaintiffs have also pointed to clear representations that they will be able to receive appointments within a certain amount of time, that

they will have access to mental health care within a reasonable distance, that they will be updated if a provider leaves the network and that the provider list is updated every 90 days. *See Duff v. Centene Corp.*, 565 F. Supp. 3d 1004, 1019 (S.D. Ohio 2021) (where contract "promis[ed] Plaintiffs 'a current list of network providers,' this could "implicate . . . contractual entitlement to a current list of network providers."). Plaintiffs' allegations strongly suggest that these terms were not met. For example, Castillo specifically described the list being virtually the same and inaccurate in August, October, and December of 2025. FAC ¶¶ 82, 85, 88. She further described that she asked the Magellan representative if her son could get out of network care and was told that "there was nothing more they could do besides send the provider directory." FAC ¶ 86. Maedal and Marto allege that they spent hours calling providers on the list and were unable to locate an available individual. *Id.* ¶¶ 102, 116-17. These types of allegations are sufficient to state a claim for breach of contract at this stage.

**d. Damages**

Blue Shield also argues that plaintiffs have not shown that they suffered any damage as a result of the alleged breaches. BS Mot. at 19-20. Plaintiffs allege plausibly that Blue Shield's mental health services were not as represented, that they had to delay treatment as a result, and that they have been denied the benefit of their bargain with Blue Shield. This is a cognizable claim even if they have not identified the specific amount. *See Duff*, 565 F. Supp. 3d at 1020 ("That being said, Plaintiffs need not quantify or prove their damages at this point in the litigation. Rather, the question is only whether they have plausibly alleged cognizable damages flowing from the alleged breach of contract."). This is sufficient to show damage for pleading purposes.

**2. Employer Contracts**

The basis for plaintiffs' breach of contract claims against the employer are that the employer contracts contain provisions that they are required to comply with "applicable state and federal statutes and regulations" and that Blue Shield has violated numerous laws. Oppo. at 13 (quoting FAC ¶ 272). For example:

i) "Sections 2799A-5 of the Public Health Service Act, 720 of ERISA, 9820 of the Internal Revenue Code of 1986 require health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider

from the directory when they are unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider." California state laws, including Section 10133.15 of the California Insurance Code and Section 1367.27 of the Knox Keene Act, impose similar requirements. FAC ¶ 273.

ii) [S]tate and federal laws—including the Affordable Care Act, the MHPAEA, Section 10133.54 of the California Insurance Code, Section 1367.03 of the Knox-Keene Act, and Section 2240.01 of Chapter 10 of the California Code of Regulations—require Blue Shield to provide an adequate mental health provider network. *Id.* ¶ 274.

i) The MHPAE, 42 U.S.C. § 300gg-26, incorporated into the Affordable Care Act via 45 C.F.R. § 156.115, provides that mental health and substance use disorder benefits must not be provided on less favorable terms than medical and surgical benefits, specifically with respect to annual, aggregate, or lifetime limits on coverage, financial requirements, treatment limitations, and out-of-network coverage. MHPAEA regulations provide that "all plan standards that limit the scope or duration of benefits for services are subject to the nonquantitative treatment limitation parity requirements. This includes restrictions such as geographic limits, facility type limits, and network adequacy." Similarly, California Health & Safety Code § 1374.72 requires that '[e]very health care service plan" that "provides hospital, medical, or surgical coverage shall provide coverage for medically necessary treatment of mental health and substance use disorders, under the same terms and conditions applied to other medical conditions.' *Id.* ¶ 275.

Blue Shield argues that a generic promise to comply with the law is insufficient to make "every alleged regulatory shortcoming into a privately actionable breach of contract." BS Reply at 10-11. But for the same reasons as with the Direct Contracts, plaintiffs' allegations are plausible for breach of the Employment Contracts. Ms. Castillo, for example, has alleged that the directory does not get updated regularly and that it is not accurate, and plaintiffs assert that their experience with BlueShield's general medical care is much different than the mental health care provided through Magellan—in particular, that they have found the lists for general medical care are updated and correct. FAC ¶¶ 90-91, 105-06. At this stage, plaintiffs have stated a claim.

**C. Breach of Implied Covenant**

The claims against Blue Shield for breach of the implied covenant, on the other hand, fail for two reasons. First, they do not plead that plaintiffs requested out of network authorization, submitted a claim or grievance, and received a denial: insurance bad-faith claims require benefits due and unreasonable withholding of those benefits. *Love v Fire Insurance Exchange*, 221 Cal.

App. 3d 1136, 1151-53 (1990). Second, they duplicate the breach of contract claims and are superfluous. As a result, Blue Shield's motion is granted with respect to the Fourth and Fifth Causes of Action.

## II. ERISA Claims

Plaintiffs bring claims under ERISA on behalf of Roiz and similarly situated plaintiffs on ERISA plans. These plaintiffs assert ERISA claims—specifically, Improper Denial of Benefits (Claim 11), Breach of Fiduciary Duty (Claim 12), and Violation of the Parity Act (Claim 13)—in lieu of contract claims that would otherwise be preempted. Plaintiffs target only Blue Shield with their Parity Act claim.

### A. Improper Denial of Benefits (Claim 11)

Blue Shield argues that Roiz's claim fails because she does not point to a specific plan term "requiring Blue Shield to permanently cover Roiz's out of network therapist at in network rates because she found it difficult to locate a different provider" and that she does not allege that she failed to exhaust her administrative remedies. Magellan also argues that Roiz's claim fails because she did not show that she actually could not locate an in-network provider within the meaning of the plan terms, not simply one that she did not find acceptable. Mag. Mot. at 18 ("At most, [Roiz] alleges that she could not locate an available in-network provider that met certain criteria imposed by Roiz, but those criteria don't appear in the plan terms").

"To prevail on a claim for benefits under [29 U.S.C. § 1132(a)(1)(B)], a plaintiff must show that (1) the plan is covered by ERISA, (2) the plaintiff is a participant or beneficiary of the plan, and (3) the plaintiff was wrongfully denied benefits owed under the plan. *Andrew P. v. Blue Cross of California*, No. 5:25-CV-02158-BLF, 2025 WL 3637030, at *2 (N.D. Cal. Dec. 15, 2025). "A plaintiff who brings a claim for benefits under ERISA must identify a specific plan term that confers the benefit in question." *Steelman v. Prudential Ins. Co. of Am.*, No. CIV S-06-2746 LKKGGH, 2007 WL 1080656, at *7 (E.D. Cal. Apr. 4, 2007) (*Stewart v. Nat'l Educ. Ass'n*, 404 F. Supp. 2d 122, 130 (D.D.C. 2005), *aff'd*, 471 F.3d 169 (D.C. Cir. 2006)).

The complaint contains a number of specific plan terms applicable to Roiz. *See, e.g.*, ¶ 201 (""If you are unable to schedule an appointment with a Participating Provider for Mental Health

and Substance Use Disorder services, contact Mental Health Customer Service. The MHSA will help you either schedule an appointment with a Participating Provider, or select a Non-Participating Provider in your area within five calendar days and contact you regarding available appointment times. For any Covered Services, you will be responsible for no more than the Cost Share for seeing a Non-Participating Provider.'"); ¶ 202 ("You have a right to receive timely and geographically accessible Mental Health/Substance Use Disorder (MH/SUD) services when you need them. If Blue Shield fails to arrange those services for you with an appropriate provider who is in the health plan's network, the health plan must cover and arrange needed services for you from an out of-network provider. If that happens, you do not have to pay anything other than your ordinary in-network cost-sharing"); ¶ 205 ("If the services cannot reasonably be obtained from a Participating Provider, we will approve your request and you will only be responsible for the Participating Provider Cost Share.").

Defendants' argument appears to mainly be their interpretation of what constitutes not being able to "schedule an appointment" or find "an appropriate provider." At this stage, I will draw all inferences in favor of the plaintiffs. Here, Roiz alleges that she tried to find an in-network provider and could not because the providers she called were not actually taking new patients. She sought to get coverage for her out-of-network mental health provider and could not because defendants said there were in-network individuals available, even though Roiz's experience was different. This is sufficient to survive a motion to dismiss on this claim.

**B. Breach of Fiduciary Duty (Claim 12)**

Blue Shield and Magellan argue that Roiz's "fiduciary duty claim is duplicative" of her ERISA benefits claim and "seeks unavailable relief." BS Mot. at 30-32. "To state a claim for breach of fiduciary duty under ERISA, a plaintiff must allege that (1) the defendant was a fiduciary; and (2) the defendant breached a fiduciary duty; and (3) the plaintiff suffered damages." *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1026 (9th Cir. 2021). "[T]he threshold question [for a breach of fiduciary duty] is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that

United States District Court
Northern District of California

person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

Defendants would cabin plaintiff's claim to their denial of out of network coverage, but their reading of this claim is too narrow. The complaint alleges that "Defendants violated their fiduciary duties of loyalty and care to Plaintiff and Class members by grossly inflating the size of their provider network and exaggerating plan benefits in order to increase enrollment and profits. Defendants knew that beneficiaries would not receive the coverage and benefits falsely represented in plan documents, including the provider directory, but made these misrepresentations to enrich themselves at the expense of Plaintiff and Class members." FAC ¶ 402. The complaint further asserts that this "harmed the ERISA plan as a whole by measurably reducing the value of the plan's assets (here, its provider network)." *Id.* ¶ 403. The complaint also alleges that injunctive relief is required because recovery of denied benefits will not fully compensate Roiz because she has also "experienced pain and suffering, spent hours fruitlessly searching for in-network care while suffering from postpartum depression, and has navigated life without mental health treatment due to her inability to access in-network mental health care because of Defendants' inaccurate and inadequate provider directory and network." *Id.* ¶ 404.

Discovery may show that Magellan did not act as a 'functional fiduciary' under ERISA, or that this claim in substance is merely the same as the denial of benefits claim. For pleading purposes, however, plaintiffs have plausibly alleged their breach of fiduciary duty claims.

**C. Parity Act Claim (Claim 13)**

Blue Shield argues that Roiz fails to adequately allege a true disparity between the mental health services of Blue Shield and the medical services as would be required for a Parity Act claim. BS Mot. at 32-33. Blue Shield also contends that Roiz is not entitled to the equitable relief she seeks. *Id.* at 33.

The Parity Act "requires that any limitations on 'mental health or substance use disorder benefits' in an ERISA plan be 'no more restrictive than the predominant treatment limitations applied to substantially all [covered] medical and surgical benefits.'" *Ryan S. v. UnitedHealth Grp., Inc.*, 98 F.4th 965, 971 (9th Cir. 2024) (quoting 29 U.S.C. § 1185(a)(3)(A)(ii)). Alongside

numeric restrictions, such as dollar and visit caps, the Act also requires parity of non-quantitative treatment limitations ("NQTL"s) between covered mental health and medical/surgical benefits. 29 C.F.R. § 2590.712(c)(1)(ii). NQTLs include:

> (D) Standards related to network composition, including . . . procedures for ensuring the network includes an adequate number of each category of provider and facility to provide services under the plan or coverage;
> (E) Plan or issuer methods for determining out-of-network rates, such as allowed amounts; usual, customary, and reasonable charges; or application of other external benchmarks for out-of-network rates;
> . . .
> (H) Restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan or coverage.

*Id.* at (c)(4)(ii). The Act specifies "in-network and out-of-network utilization rates" and "network adequacy metrics (including time and distance data, and data on providers accepting new patients)," among its list of relevant outcomes for NQTLs "related to network composition." *Id.* at (c)(4)(iii)(A)(2). Importantly, insurers "may not disregard relevant outcomes data that it knows or reasonably should know suggest that a [NQTL] is associated with material differences in access" between covered mental health and medical/surgical benefits. *Id.* at (c)(4)(iii)(A).
Three types of cases can be brought under the Parity Act: "(1) *facial exclusion* cases, (2) *as-applied* cases, and (3) *internal process* cases." *Ryan S.*, 98 F.4th at 971 (emphasis in original).

Although Roiz does not affix the NQTL label to the defendants' alleged mental health "ghost networks," her allegations suffice to describe a plausible difference in access to mental health versus medical and surgical services under the Parity Act under an internal processes theory. FAC ¶ 415 ("Blue Shield's processes for ensuring network adequacy for mental health providers were less rigorous and less effective than the processes applied to medical/surgical providers."). The complaint asserts that Roiz "called ten providers listed on Defendants' directory. Contrary to the representations in the directory, all the providers she called were out of network, were unavailable to treat Ms. Roiz, or did not offer the services listed." *Id.* ¶ 60. She said that when she reported her difficulty in finding an in-network provider, "Defendants' representative told her that sometimes the online directory is not up to date and offered to send [Roiz] a hard copy.

[Roiz]accepted the offer, but when she received the hard copy, she confirmed it was the same as the inaccurate online directory she had referenced initially." *Id.* ¶ 61.

Again, in 2026, she attempted to find a therapist again and called six providers, none of whom were taking new patients. *Id.* ¶ 65. In contrast, Roiz alleges that she "encountered no inaccurate information in Blue Shield's directory of medical and surgical providers and found that directory to be much more reliable than Defendants' directory of mental health providers." FAC ¶ 66. She describes that, in February 2025, she was looking for a gastroenterologist and was able to find one in the area without any wait time through Blue Shield's online directory. *Id.* ¶ 68. At the motion to dismiss stage, this is sufficient to infer a disparity in how Blue Shield approached the accuracy and breadth of its mental health providers versus its medical and surgery providers.

## III. Other State Law Claims

Plaintiffs also bring claims for unfair competition under California Business and Professions Code § 17200 ("UCL"), intentional and negligent misrepresentation, and restitution.

### A. Role of ERISA Preemption on State Law Claims

As an initial matter, Magellan argues that these claims are preempted by ERISA for Roiz and the ERISA group. Mag. Mot. at 5-6. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144. There are "'two categories' of state-law claims that 'relate to' an ERISA plan—claims that have a 'reference to' an ERISA plan, and claims that have 'an impermissible connection with' an ERISA plan." *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 665 (9th Cir. 2019) (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016)). "A state-law claim has a 'reference to an ERISA plan' if it 'is premised on the existence of an ERISA plan' or if 'the existence of the plan is essential to the claim's survival.'" *Id.* (citations omitted). "A claim has 'an impermissible connection with' an ERISA plan if it 'governs a central matter of plan administration' or 'interferes with nationally uniform plan administration,' or if it 'bears on an ERISA-regulated relationship.'" *Id.* at 666 (citations omitted).

Plaintiff Roiz's claims do not reference and have no meaningful connection to her ERISA plan. Her state law claims revolve around misrepresentations related to plan benefits, which are

outside the scope of ERISA preemption. It does not apply in this setting.

### B. Pleading Fraud Under Rule 9(b)

Several claims involve allegations of fraudulent conduct, including at a minimum the fraudulent prong of the UCL as well as the allegation of intentional misrepresentation.[3] Defendants argue generally that none of the misrepresentations alleged by plaintiffs meets the heightened pleading standard under Federal Rule of Civil Procedure 9(b). Rule 9(b) requires any circumstances of fraud be pleaded with particularity "to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 785 (9th Cir. 2024) (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)). "In other words, the pleading 'must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false.'" *Depot*, 915 F.3d at 668 (quoting *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013)).

Here, plaintiffs assert the following misrepresentations:

i. The contract language as cited above in III(B)(1)(a) and (b)

ii. On a web page titled "Blue Shield's network," Blue Shield says that "[o]ur network of doctors and hospitals is designed to meet the needs of members … A full selection of behavioral health providers for mental health care and substance use treatment are available. Additional specialists are included in our network if they meet our credentialing requirements to help make sure members have access to a larger number of doctors within a reasonable distance from home." FAC ¶ 177

iii. "If you need help finding behavioral health support, Find a doctor can help you search for in-network providers covered by your benefit plan. If you can't find the provider or service you're looking for—or want help choosing the right type of care—call the Mental Health Customer Service number on your ID card." *Id.* ¶ 178

iv. "[Through] Find a Doctor[, w]e offer access to a wide range of doctors, specialists, and hospitals to help you find

---

[3] The law is unsettled as to whether the heightened pleading requirements apply to negligent misrepresentation. *See Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413, 418 (C.D. Cal. 2012) (no heightened pleading for negligent misrepresentation); *but see Zetz v. Bos. Sci. Corp.*, 398 F. Supp. 3d 700, 713 (E.D. Cal. 2019) (explicitly rejecting *Petersen* and applying a heightened standard to both).

United States District Court
Northern District of California

care wherever you live or work. Our PPO [and] HMO … networks are among the largest in California." *Id.* ¶ 179

v. Blue Shield promises on its website that, "[n]o matter what level of behavioral health care you need, you have inpatient and outpatient options." *Id.* ¶ 180.

They also cite the following omissions that defendants allegedly had the duty to disclose:

a) the inadequacy of Defendants' mental health provider network to meet members' needs;
b) the extent of provider directory inaccuracies;
c) that the vast majority of in-network mental health providers are not accessible because they are not actually taking new patients;
d) the likelihood that members will be unable to find an in-network mental health provider through the directory;
e) the likelihood that members will need to delay or forgo care, or resort to using an out of-network provider; and
f) the likelihood that members will be unable to use the coverage that their plan provides for in-network mental health care.

FAC ¶ 211.

As an initial matter, these appear to all be statements accredited to Blue Shield. Plaintiffs do not identify any specific statements by Magellan. They only say that "[o]n information and belief, Magellan's website and publicly available marketing materials featured substantially similar statements regarding the accuracy and robustness of the mental health network." FAC ¶ 181.[4] This is not sufficient to plead fraud with particularity against Magellan under Federal Rule of Civil Procedure 9(b). To the extent that the remaining state law claims sound in fraud against Magellan, they are dismissed.

As for Blue Shield, the plaintiffs identify specific statements that they found on Blue Shield's website and other relevant materials. They state that they looked at the Blue Shield's statements on its website in choosing a Blue Shield plan. FAC ¶¶ 73, 95, 99, 110-11. This establishes the "who, what, when, where, why, how" required. The statements are identified with particularity and the claims are plausible.

[4] Plaintiffs do not allege how Magellan specifically had a duty to disclose any of the alleged omissions. They do not plead any affirmative statements by Magellan that it would need to correct, nor do they show that Magellan had a fiduciary-type relationship with plaintiffs or that it engaged in active concealment of the facts. *See Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1086 (N.D. Cal. 2022)

**C. UCL Violations (Claim 7)**

**1. Unlawful Prong**

The "unlawful" prong of the UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (cleaned up). Blue Shield and Magellan argue that plaintiffs cannot bring a claim under the UCL unlawful prong because they fail to specifically allege that Blue Shield or Magellan violated any laws. BS Mot. at 22; Mag. Mot. at 14-15.

Plaintiffs cite a litany of statutory predicates for their UCL unlawful claim: "No Surprises Act, the Affordable Care Act, ERISA, the Internal Revenue Code, the MHPAEA, California Business & Professions Code Section 17500, California Insurance Code Sections 790.02, 10133.15, and 10133.54, Sections 1367.03, 1367.27, and 1360 of the Knox-Keene Act, Section 2240.01 of Chapter 10 of the California Code of Regulations and California Health & Safety Code Section 1374.72." FAC ¶ 324. Plaintiffs go through each statutory basis and allege how the defendants breached each one. *Id.* ¶¶ 325-46. Their claims include the breach of the Parity Act and the failure to update the provider list every 90 days. The UCL unlawful prong claims survive.

**2. "Unfair" and "Fraudulent"**

The "unfair" prong of the UCL creates a cause of action for a "business practice that is unfair even if not proscribed by some other law." *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1225 (N.D. Cal. 2014) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003)). Courts apply two tests to analyze "unfair" UCL claims: (1) a balancing test, and (2) a tether test. *Prince-Weithorn v. GMAC Mortg.*, LLC, No. CV 11-00816 SJO (PLAx), 2011 WL 11651984, at *7 (C.D. Cal. May 5, 2011). Under the "balancing" test, courts consider whether the challenged business practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010). Under the tether test, a plaintiff must show that the actions of defendants are "comparable to or the same as a violation of the law, or otherwise

significantly threatens or harms competition." *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d at 1226 (cleaned up).

The pleading on this prong is very bare bones. Plaintiffs do not address either of the tests and simply assert that "Defendants acted unfairly by creating the illusion of a robust mental health provider network and charging inflated premiums for plans that did not include such a network." Oppo. at 18; *see also* FAC ¶ 347 ("In addition to being unlawful, Defendants' misrepresentations of the coverage provided by the plans and the breadth of their provider network constitute unfair and fraudulent business practices and deceptive advertising."). This is not sufficient to state a claim under the unfair prong.

The allegations around the fraudulent prong presumably overlap significantly (or entirely) with the allegations comprising the misrepresentation claims. I address them in the context of the misrepresentation claims, below. As noted above, plaintiffs have failed to allege fraud with particularity against Magellan and any fraud-based claim against Magellan is dismissed.

**3. Economic Injury**

Blue Shield and Magellan both assert that plaintiffs fail to adequately allege an economic injury as required for a UCL claim. A private party bringing a UCL claim must have suffered "injury in fact" and "lost money or property" as a result of the unfair competition. *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322 (2011). For example, a "plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." *Id.* at 323.

Plaintiffs allege that they "have lost money, including through inflated premiums and improper out-of-network expenses." FAC ¶ 349. They also allege that these violations "have caused millions of dollars in damages; denied Plaintiffs the benefits to which they were entitled under their health plans and for which they paid premiums (most notably, coverage for in-network mental health care and access to the supposedly broad network of available providers) . . . caused Plaintiffs and Class members to pay inflated premiums for a virtually worthless product; caused

United States District Court
Northern District of California

Plaintiffs and Class members to incur significant out-of-pocket expenses for out-of-network provider payments, which greatly exceed the costs Plaintiffs would have incurred for the same services from in-network providers; caused Plaintiffs and Class members to reduce spending on necessities and other life costs; induced Plaintiffs and Class members to enroll in Blue Shield's plan instead of better and/or cheaper plans . . . ." *Id.* ¶ 350. It is not clear, other than Roiz, that any of the plaintiffs have incurred out-of-pocket expenses, as discussed above. It is also not apparent how plaintiffs arrived at the calculation that defendants have caused "millions of dollars in damages."

At this stage, however, plaintiffs have plausibly stated that they have been paying for a health care plan that does not provide the benefits that it purported to have—thus, such payments are improperly inflated. This is a sufficient economic injury to allow the UCL claim to proceed.

**4. Standing for Equitable Relief and Inadequate Remedies at Law**

Magellan argues that plaintiffs cannot demonstrate standing to sue for injunctive relief under the UCL because they cannot show a future injury and that they cannot show that their remedies at law are inadequate. These arguments are better addressed after discovery. At this point, the pleadings are plausible.

**D. Intentional and Negligent Misrepresentation (Claim 8 and 9)**

"The elements of a claim for intentional misrepresentation are (1) a misrepresentation; (2) knowledge of falsity; (3) intent to induce reliance; (4) actual and justifiable reliance; and (5) resulting damage." *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 77 F. Supp. 3d 887, 897 (N.D. Cal. 2014) (citing *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996)). Negligent misrepresentation claims encompass similar elements except that they do "not require knowledge of falsity, but instead requires a misrepresentation of fact by a person who has no reasonable grounds for believing it to be true." *Id.* (citing *West v. JPMorgan Chase Bank, N.A.*, 214 Cal.App.4th 780, 792 (2013).

**1. Actionable Statements**

Blue Shield argues that the misrepresentations alleged by plaintiffs are not actionable statements of fact but reflect mere puffery. BS Mot. at 25-26. "A statement is considered puffery

if the claim is extremely unlikely to induce consumer reliance." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008).

Here, the statements alleged by plaintiffs are more than puffery. Plaintiffs point to statements like: (1) "[a] full selection of behavioral health providers for mental health care and substance use treatment are available," FAC ¶ 177; and (2) "[n]o matter what level of behavioral health care you need, you have inpatient and outpatient options." *Id.* ¶ 180. These statements are more than a marketing tool, they concretely represent that the networks have options for different types of needs, which according to plaintiffs' allegations, was not their experience.

**2. Justifiable Reliance**

Blue Shield argues that plaintiffs cannot show justifiable reliance on any of the statements because they do not identify specific representations that they saw and relied upon in enrolling, they fail to identify the other option they would have chosen, and all had extensive experience with Blue Shield's networks and its limitations so could not have been misled in enrolling or re-enrolling in the plan. BS Mot. at 26-27.

I conclude that plaintiffs have alleged sufficient reliance. In the complaint, they allege that based on the misrepresentations and omissions by Blue Shield, they chose to enroll in Blue Shield's plans "(instead of better, cheaper options) based on the lies Defendants told about their provider network." FAC ¶ 359; *see also id.* ¶ 348 ("Plaintiffs and other Class members relied on Defendants' false and deceptive advertising when deciding to enroll in coverage with Blue Shield."). Plaintiffs also allege that they "detrimentally relied on Defendants' inaccurate directory when searching for in-network providers. That detrimental reliance caused them to waste countless frustrating hours searching in vain for available, in-network providers." *Id.* ¶ 359.

**3. Economic Loss**

Blue Shield argues that the misrepresentation claims are barred by the economic loss rule because the plaintiffs seek only economic damages. BS Mot. at 27-28. "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 988 (2004). The economic loss doctrine

generally does not apply "when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion; or (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." *Id.* at 990 (citations omitted).

The economic loss doctrine does not apply. There is a common law tort claim, the means used to breach the contract are allegedly tortious in nature, and the result of the breach was foreseeable and allegedly caused severe harm.

**E. Unjust Enrichment (Claim 10)**

Although there is no cause of action in California for unjust enrichment, "[v]arious causes of action may allege that a defendant has been unjustly enriched and that restitution is required." *World Surveillance Grp. Inc. v. La Jolla Cove Investors, Inc.*, No. 13-CV-03455-WHO, 2014 WL 1411249, at *2 (N.D. Cal. Apr. 11, 2014). "In such cases, where appropriate, the law will imply a contract (or rather, a quasi-contract), without regard to the parties' intent, in order to avoid unjust enrichment." *Durell v. Sharp Healthcare,* 183 Cal.App. 4th 1350, 1370 (2010). "A plaintiff may not, however, pursue or recover on a quasi-contract claim if the parties have an enforceable agreement regarding a particular subject matter." *Klein v. Chevron U.S.A., Inc.*, 202 Cal.App. 4th 1342, 1388 (2012), *as modified on denial of reh'g* (Feb. 24, 2012).

It is too soon to conclude that this claim is unavailable to plaintiffs with respect to Blue Shield. It is unclear, however, how this claim could apply to Magellan, and it is not sufficiently pleaded, so Magellan will be dismissed.

**CONCLUSION**

Accordingly, I GRANT Blue Shield's Motion to Dismiss the Fourth and Fifth Causes of Action, GRANT Magellan's Motion to Dismiss the Third, Sixth, Eighth, Ninth and Tenth Causes of Action and DENY the remainder of the motions, with leave to amend. Plaintiffs shall file any

United States District Court
Northern District of California

amended pleading within 20 days.

**IT IS SO ORDERED.**

Dated: September 23, 2026

William H. Orrick
United States District Judge